**UNITED STATES of America, Appellee,**

v.

**Murdock HEAD, Appellant. (Two cases)**

Nos. 81–5123, 81–5184.

United States Court of Appeals,
Fourth Circuit.

Argued July 15, 1982.

Decided Dec. 30, 1982.

Rehearing and Rehearing En Banc Denied Feb. 10, 1983.

Frank W. Dunham, Jr., Arlington, Va. (Brian P. Gettings, Wallace H. Kleindienst, William L. Jacobson, Leonard, Cohen, Gettings & Sher, Arlington, Va., on brief), for appellant.

David B. Smith, Theodore S. Greenberg, Asst. U.S. Attys., Alexandria, Va. (Justin W. Williams, U.S. Atty., Alexandria, Va., on brief), for appellee.

Before WINTER, Chief Judge, and PHILLIPS and ERVIN, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

These are consolidated appeals by Dr. Murdock Head from an interlocutory pretrial order denying his "double jeopardy" pleas, No. 81–5123, and from a final judgment of conviction on a two-count indict-

ment charging conspiracy to bribe and to evade taxes and a substantive illegal gratuity offense, No. 81–5184. We find no merit in either Head's "double jeopardy" claims or in numerous assignments of error related to the prosecution and trial of the case, and therefore affirm the conviction.

## I

The essential factual background of this appeal is related in *United States v. Head,* 641 F.2d 174 (4th Cir.1981). We summarize only its more critical features here.

Murdock Head was Executive Director of the Airlie Foundation until indicted in 1979. The Foundation, a tax exempt educational association which conducts seminars and produces documentary films, subcontracted its film-making work to Raven's Hollow Limited, a taxable enterprise formed by Head. The Foundation received substantial federal monies from a House of Representatives Subcommittee chaired by Congressman Daniel Flood.

Head was first convicted and sentenced to three years' imprisonment in the fall of 1979 under an indictment containing thirteen counts, one of conspiracy and the others of various substantive offenses. He was found guilty only on the conspiracy count which alleged a single conspiracy with three illegal objects: (1) the bribery of Congressman Flood and his aide, Steven Elko (the "Flood/Elko object"); (2) the giving of a thing of value to Jesse Hare, an Internal Revenue Service agent (the "Hare object"); and (3) the evasion of Raven's Hollow Limited's federal income taxes (the "tax object"). One substantive count was dismissed upon motion of the government. Four others concerning Head's dealings with IRS agent Hare were dismissed by the district court after the government had presented its case. The district court also dismissed four of the six counts dealing

with substantive tax violations in connection with the Raven's Hollow returns, and the jury acquitted Head on the other two substantive tax counts.

On Head's appeal from his conspiracy conviction, we reversed and granted a new trial, *United States v. Head,* 641 F.2d 174 (4th Cir.1981), on the basis that the jury had not been instructed on the statute of limitations and hence might have predicated its guilty verdict on events occurring outside the applicable period.

The second trial, from which the present appeals arise, was not merely a retrial on the conspiracy count of the original indictment. Following remand, the government reduced the scope of the conspiracy count by eliminating the Hare object.[1] On the other hand, the government—with Head's consent—added a substantive "gratuity" count alleging a violation of 18 U.S.C. § 201(f).

Prior to the second trial, Head filed a motion *in limine* in the district court, seeking to strike the tax object of the conspiracy count along with related overt acts, and to preclude the government from introducing proof to support those allegations. Moreover, Head moved to dismiss the entire indictment,[2] arguing both that application of collateral estoppel principles rendered the conspiracy count duplicitous and that double jeopardy barred retrial on the conspiracy count because prosecutorial misconduct in the first trial had preserved trial court error in the jury instructions on the statute of limitations.

The district court denied the motions, and Head noticed an interlocutory appeal and sought a stay of the trial court proceedings pending the appeal. Following district court refusal of a stay, we also declined to grant the stay or then to entertain the appeal, and Head's trial began eight days later.

---

1. The government acquiesced in a suggestion by the district judge that it should not attempt to prove the Hare object of the conspiracy because in all likelihood the judge would dismiss that object at the end of the trial.

2. Head sought dismissal of the entire indictment in the district court on May 15, 1981. The information charging a substantive gratuity count under 18 U.S.C. § 201(f) was not filed and consolidated with the conspiracy count until May 18, 1981.

The jury returned a general verdict of guilty on both the conspiracy count and the substantive gratuity count. Head then noticed an appeal from the final judgment, which, as earlier indicated, we then consolidated with his earlier interlocutory appeal.

On these appeals, Head makes the following contentions: (1) under *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), his interlocutory appeal from denial of his "double jeopardy" objections gave rise to a right to immediate review and divested the trial court of jurisdiction to proceed with trial pending that review; [3] (2) his "double jeopardy" rights were in any event violated by putting him to second trial, so that his conviction must be reversed; (3) specific rulings and the overall conduct of the trial judge constituted reversible error; and (4) the evidence adduced at the second trial was insufficient to support the conviction on either count.

## II

When we declined on Head's interlocutory appeal in No. 81–5123 to review on the merits his denied "double jeopardy" claims or to grant his requested stay of trial pending appeal, the effect, as intended, was to dispose summarily of those claims on the basis that, as double jeopardy claims, they were frivolous. *See Abney,* 431 U.S. at 662 n. 8, 97 S.Ct. at 2041 n. 8.[4]

We issued no written opinion at that time but retained jurisdiction of that appeal while the second trial proceeded and later consolidated the interlocutory appeal with the appeal from final judgment in No. 81–5184. We write now to give our reasons for that summary disposition of the interlocutory appeal.[5]

The three "double jeopardy" claims presented and denied on Head's motion *in limine* in the district court were based, respectively, on collateral estoppel, prosecutorial misconduct, and duplicitousness of the second trial indictment. On the basis of the motion papers upon which these claims were advanced in the district court,[6] we considered each to be "frivolous" in the sense contemplated by the *Abney* decision, so that interlocutory review of their denial was properly refused.

Our analysis proceeded on the assumption that "frivolousness" in the *Abney* sense must embrace both a perception that a claim that is manifestly "double jeopardy" in substantive content is wholly lacking in merit, and a perception that a claim advanced as one of "double jeopardy" is mani-

---

**3.** The "lack of jurisdiction" element of this contention rises or falls with the more fundamental contention that *Abney* gave rise to an enforceable right to interlocutory review of the denial of the "double jeopardy" objections.

Because in Part II we reject the contention that in this case any such special right to review could have existed, the "lack of jurisdiction" argument falls with it.

**4.** In the cited footnote, the *Abney* Court observed that in administering its announced rule of interlocutory appealability of double jeopardy claims, the courts of appeals might "establish summary procedures and calendars to weed out frivolous claims of former jeopardy." *See also United States v. Leppo,* 634 F.2d 101 (3d Cir.1980) (district court retains jurisdiction when defendant notices appeal raising a frivolous double jeopardy claim); *United States v. Dunbar,* 611 F.2d 985 (5th Cir.) (same), *cert. denied,* 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980).

**5.** Because of our holding that the claims were "frivolous" in the *Abney* sense, we need not address Head's novel contention that if they

were not "frivolous" he is entitled to reversal of his conviction even if the claims were ultimately found to be without merit. This draconian theory builds off language in *Abney* arguably suggesting that interlocutory review of denied double jeopardy claims may be a matter of constitutional right because review at that stage is necessary to protect against second trials barred by double jeopardy. *See Abney,* 431 U.S. at 660, 662, 97 S.Ct. at 2040, 2041.

We observe of this draconian theory only that it flies in the fact of the *Abney* Court's introductory admonition that "there is no constitutional right to an appeal" and the corollary that "[t]he right . . ., as we presently know it in criminal cases, is purely a creature of statute." 431 U.S. at 656, 97 S.Ct. at 2038. *See People ex rel. Mosley v. Carey,* 74 Ill.2d 527, 537–39, 25 Ill.Dec. 669, 673–75, 387 N.E.2d 325, 329–31, *cert. denied sub nom. Mosley v. Illinois,* 444 U.S. 940, 100 S.Ct. 292, 62 L.Ed.2d 306 (1979).

**6.** They were before us as portions of the record on appeal in No. 81–5123.

festly not that in substantive content. On this basis, for reasons that follow, we considered none of the claims to be true double jeopardy claims, without regard to their degree of apparent merit on grounds other than double jeopardy.

### A

Head's primary "double jeopardy" claim was that his first trial acquittal—by court dismissal and jury verdict—on all the substantive tax offenses precluded his represecution on the tax object and related overt acts in the conspiracy count remanded for retrial. Under *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), he contends, the factual determinations necessarily implicit in his acquittal must be given collateral estoppel effect which, per *Ashe,* is constitutionally guaranteed by the Double Jeopardy Clause.

*Ashe* did of course hold that principles of collateral estoppel which had long been applied as an "established rule of federal criminal law," *id.* at 445, 90 S.Ct. 1195, were actually "embodied in the Fifth Amendment guarantee against double jeopardy," *id.* at 443, 90 S.Ct. at 1194, and that on the facts of that case their application barred a second trial. But the holding was in a context where a fact necessarily determined in the defendant's favor by his earlier acquittal made his conviction on the challenged second trial for a concededly different offense impossible unless the fact could be relitigated and determined adversely to the defendant.[7] In such a context, despite the technical difference between the two offenses, the guarantees of the Double Jeopardy Clause against being required to " 'run the gantlet' a second time," *id.* at 446, 90 S.Ct. at 1195, or being subjected to the "hazards of trial and possible conviction more than once," *id.* at 447, 90 S.Ct. at 1196

(Black, J., concurring), were held to preclude relitigation of the critical fact so that the second prosecution must be absolutely barred. *See also Phillips v. United States,* 502 F.2d 227 (4th Cir.1974), *vacated on other grounds,* 518 F.2d 108 (4th Cir.1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1483, 47 L.Ed.2d 747 (1976).

We understand the holding in *Ashe* to be limited to its factual context, so that double jeopardy guarantees are not engaged by collateral estoppel which, if applied, would merely restrict proof but not make conviction impossible.[8] Since successful interlocutory appeal from denial of such a collateral estoppel claim could only lessen and not wholly remove the possibility of conviction and lesser associated hazards of being again tried, *see Abney,* 431 U.S. at 661–62, 97 S.Ct. at 2041, no constitutional, as opposed to legal, right is at stake in such a claim. *See id.* at 659, 97 S.Ct. at 2040 (contrasting, for appealability purposes, double jeopardy and evidence suppression rulings); *United States v. Powell,* 632 F.2d 754, 758 (9th Cir.1980) (refusal to limit proof on collateral estoppel grounds not immediately appealable); *United States v. Mock,* 604 F.2d 336, 338–40 (5th Cir.1979) (same); *but cf. United States v. Larkin,* 605 F.2d 1360 (5th Cir.1979) (interlocutory appealability assumed though collateral estoppel would merely restrict proof), *modified on other grounds,* 611 F.2d 585 (5th Cir.), *cert. denied,* 446 U.S. 939, 100 S.Ct. 2160, 64 L.Ed.2d 793 (1980); *United States v. DeVincent,* 632 F.2d 155, 160–61 & n. 10 (1st Cir.1980) (same, though distinction between proof-limiting and double jeopardy-collateral estoppel recognized), *cert. denied,* 450 U.S. 984, 101 S.Ct. 1522, 67 L.Ed.2d 820 (1981).

---

**7.** On first trial defendant was acquitted, by general verdict of not guilty, of a charge of robbing *A.* The first trial record revealed that this necessarily involved a determination that defendant was not a participant in the single-episode robbery of *A, B* and others. The challenged second trial involved a charge that defendant had in that same episode robbed *B.*

**8.** Judge Adams' comment in *Phillips,* 502 F.2d at 230 n. 14 (sitting by designation), that collateral estoppel appeared "coextensive" with double jeopardy principles, is not at odds—viewed in context—with the distinction we draw. In *Phillips,* as in *Ashe,* it was "coextensive" on the facts.

█ Here, even if collateral estoppel were applied as Head contended it should be, its effect could only have been to limit proof of the tax object of the conspiracy, not absolutely to prevent conviction on the conspiracy count.[9] Other objects remained upon which conviction could have been based. Accordingly, Head's collateral estoppel claim on its face did not invoke double jeopardy protections under *Ashe*.

**B**

Head's next "double jeopardy" objection was that because the error that led to reversal of his first conviction—failure to instruct properly on the statute of limitations—was "knowingly" induced by prosecutorial misconduct, his retrial should be barred.

█ Prosecutorial misconduct may undoubtedly invoke double jeopardy protections—as opposed to possible due process protections—in two situations: where it leads a court *sua sponte* to declare a mistrial as a matter of "manifest necessity," *United States v. Dinitz,* 424 U.S. 600, 608, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976); or where it has, by intention of the prosecu-

tor, goaded a defendant into seeking a mistrial that is then granted on his motion, *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 2088, 72 L.Ed.2d 416 (1982). In either situation, double jeopardy protections are engaged because the misconduct has involuntarily deprived the defendant of the "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949).

█ Here, trial before the first tribunal had been completed with no request for mistrial having been made. The suggestion of prosecutorial misconduct was only raised after defendant's appeal had secured a retrial because of trial court error that was found independently of any prosecutorial misconduct in its inducement.[10] In that situation no double jeopardy right of the defendant had been implicated, and this was manifest when the motion *in limine* was denied. Accordingly, as with the collateral estoppel objection, this one on its face did not invoke double jeopardy rights entitling Head to interlocutory review under *Abney*.[11]

---

**9.** Head attempts to distinguish, for this purpose, mere evidence-limiting collateral estoppel from collateral estoppel that would preclude the establishment of a "discrete basis" for a jury verdict. The latter, he claims, if not the former, rises to the level of "double jeopardy-collateral estoppel." This attempted distinction is one without a difference. The true distinction occurs, as indicated, at the point where the preclusion would run to reprosecution of a discrete criminal "offense." On this basis it might of course run to only one of multiple counts of an indictment, *see, e.g., Price v. Georgia,* 398 U.S. 323, 331, 90 S.Ct. 1757, 1762, 26 L.Ed.2d 300 (1970); *Green v. United States,* 355 U.S. 184, 189–91, 78 S.Ct. 221, 224–225, 2 L.Ed.2d 199 (1957), but it could not run to any mere evidence-limiting or "discrete basis" objection related to an otherwise provable criminal "offense."

**10.** We are aware of three circuit decisions containing suggestions that where a defendant secures reversal of his conviction because of prosecutorial misconduct following denial of his trial court motion for mistrial on that ground, double jeopardy protections might bar his retrial. *See United States v. Rios,* 637 F.2d 728, 729 (10th Cir.1980), *cert. denied,* 452 U.S.

918, 101 S.Ct. 3054, 69 L.Ed.2d 422 (1981); *United States v. Opager,* 616 F.2d 231, 236 n. 13 (5th Cir.1980); *United States v. Heymann,* 586 F.2d 1039, 1040 (5th Cir.1979) (Hill, J., concurring).

Whether this situation, as well as those in which mistrial has been granted, engages double jeopardy protections, we need not address, since it is not presented here. *Cf. Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 2090 n. 6, 72 L.Ed.2d 416 (1982); *Burks v. United States,* 437 U.S. 1, 15, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978).

**11.** We are aware that the Ninth Circuit has held that under *Abney's* rationale—though not by its specific holding—the denial of pre-trial claims of prosecutorial misconduct are immediately appealable though no double jeopardy rights are involved. *United States v. Griffin,* 617 F.2d 1342 (9th Cir.), *cert. denied,* 449 U.S. 863, 101 S.Ct. 167, 66 L.Ed.2d 80 (1980). With respect, we find the contrary views of the Fifth Circuit, *see United States v. Gregory,* 656 F.2d 1132 (5th Cir.1981), and of the Seventh Circuit, *see United States v. Rosario,* 677 F.2d 614 (7th Cir.1982), more persuasive.

C

Head's final "double jeopardy" objection was a convoluted one that built off his collateral estoppel contention. If the tax object was barred by collateral estoppel from reprosecution, he argued, this removed the only link between the "Hare object" and the "Elko object" of the conspiracy as originally charged that had made it a single conspiracy with multiple objects rather than three separate conspiracies. On this basis, the single conspiracy count was now made duplicitous by charging two separate conspiracies. This raised an "adjunct double jeopardy bar" whose rejection by the district court gave rise under *Abney* to a right to interlocutory review.

Again reserving all questions of the merits of the duplicitousness contention, the context in which it was raised in this case could not have invoked the double jeopardy protections with which *Abney* was concerned.

*Abney* itself reveals the only context—a different one than that here—in which a claim of duplicitousness could invoke double jeopardy protections against a second trial. In that case a first trial conviction by general verdict of guilty had been reversed on appeal. In remanding, the court of appeals, finding the indictment to have been duplicitous, ordered an election before retrial. Following the election and before retrial, the defendant raised a double jeopardy claim on the basis that the general verdict was necessarily ambiguous on the question whether the jury might have acquitted him of the single offense with which he was now charged under the election and found him guilty only on the now-dropped other offense. The double jeopardy right invoked was therefore the right not to be tried again for the same offense, with questions of ambiguity resolved in the defendant's favor. *See Abney,* 431 U.S. at 664, 97 S.Ct. at 2042. Assuming, without deciding, that such a claim of ambiguity might invoke the double jeopardy right in an appropriate case, *id.,* the *Abney* Court found that it was not invoked in the case at hand because of jury instructions that removed any possibili-ty of ambiguity, *id.* at 664–65, 97 S.Ct. at 2042–43.

In the instant case, this was manifestly not the context within which the objection of duplicitousness was raised. Here there had been no prior conviction by arguably ambiguous general verdict on an arguably duplicitous indictment. There was only an impending trial on an arguably newly duplicitous indictment. Double jeopardy does not protect against the mere possibility that a duplicitous indictment may result in an ambiguous general verdict of conviction that will then be followed by reversal and retrial upon an offense of which the jury may actually have acquitted.

Accordingly, this objection also did not on its face invoke any double jeopardy rights with whose protection by interlocutory appeal *Abney* was concerned.

III

We turn now to the merits of the set of "double jeopardy" objections which, though not subject to interlocutory review under *Abney,* are nevertheless properly presented for review on Head's appeal from the final judgment of conviction.

A

In that setting, we address Head's claim of collateral estoppel under the longstanding rule of federal practice applying this branch of res judicata doctrine to criminal cases. *See Ashe,* 397 U.S. at 443, 90 S.Ct. at 1194. If Head was entitled by it to a limitation of proof that was denied and that prejudiced his trial, his judgment of conviction must be reversed. We conclude, however, that collateral estoppel did not require any limitation of proof.

The essence of the collateral estoppel claim is that Head's acquittal at his first trial on the substantive tax counts of the indictment precluded government attempts at the second trial to prove the tax object of the conspiracy, particularly the aver-

ments of Overt Acts 19 and 20.[12] To assess this contention, we must examine the bases for Head's acquittals on the substantive counts, taking heed of the Supreme Court's admonition that we "examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Ashe,* 397 U.S. at 444, 90 S.Ct. at 1194.

Head's acquittals on the substantive tax counts may be grouped into two categories. Three false filing counts, alleging violations of 26 U.S.C. § 7206(2), were dismissed by the trial judge at the close of the government's case-in-chief. The record makes quite apparent that the trial court dismissed these counts because the government had failed to prove that Head had actually prepared the Raven's Hollow tax returns at issue.[13] This basis for dismissal did not establish in Head's favor any fact relevant to and necessarily at issue in relitigation of the averments contained in Overt Acts 19 and 20. *See United States v. Scott,* 437 U.S. 82, 97–98 & nn. 9 & 11, 98 S.Ct. 2187, 2197 & nn. 9 & 11, 57 L.Ed.2d 65 (1978).

The second set of substantive tax counts alleged that Head had aided and abetted the evasion of income taxes by Raven's Hollow, in violation of 26 U.S.C. § 7201.

The jury acquitted Head on two of these three counts, and the trial judge acquitted Head of a third count on which the jury had hung.[14]

■ Head's argument that these acquittals should have precluded the government from introducing evidence on Overt Acts 19 and 20 misapprehends collateral estoppel doctrine. Head contends it is *possible* that the first jury established the factual averments of Overt Acts 19 and 20 in his favor; collateral estoppel applies, however, only to facts *necessarily* determined in the defendant's favor. *United States v. Nash,* 447 F.2d 1382, 1385 (4th Cir.1971); *accord United States v. Lee,* 622 F.2d 787, 790 (5th Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 303 (1981).

In order to find Head guilty on the counts alleging violations of § 7201, the jury was instructed that the amount evaded had to be "substantial." *See United States v. Marcus,* 401 F.2d 563, 565 (2d Cir.1968), *cert. denied,* 393 U.S. 1023, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969). Given that this factual issue was hotly disputed on the evidence presented at trial, it cannot be true that Head's acquittals on these counts necessarily determined the allegations of Overt Acts 19 and 20 in his favor. The jury verdicts— and the court's treatment of the count on which the jury had hung—obviously could have been predicated solely on the amount of tax evaded.[15] In this circumstance, Head

---

**12.** Overt Act 19 alleged:

On or about May 2, 1975, Murdock Head caused to be prepared, signed and mailed from Airlie, Virginia to the Internal Revenue Service Memphis Service Center, Memphis, Tennessee, a corporation income tax return in the name of Raven's Hollow for the fiscal year 1974.

Overt Act 20 was virtually identical, except that it pertained to fiscal year 1975, and to acts occurring on or around May 18, 1976.

**13.** This ruling was clearly contrary to decisions by numerous circuits holding that § 7206(2) applies to individuals who are involved in the concealment of a taxable business interest, even if they do not actually prepare the tax return. *See, e.g., United States v. Wolfson,* 573 F.2d 216, 225 (5th Cir.1978); *United States v. Crum,* 529 F.2d 1380, 1382 (9th Cir.1976).

**14.** The government's evidence on these three tax counts was essentially identical, except that the amount of net tax due varied between years. The jury acquitted Head on the counts relating to tax years 1974 and 1975, when the amounts evaded were alleged to be relatively small: $9,294 and $6,249, respectively. In contrast, the jury was hung on the count relating to tax year 1976, when the amount evaded was allegedly $43,695.

**15.** Head's claim of collateral estoppel is therefore readily distinguished from those made in other cases where a general jury verdict of acquittal has precluded the relitigation of factual issues necessarily decided in the defendant's favor. *See, e.g., Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970); *United States v. Leach,* 632 F.2d 1337 (5th Cir. 1980); *United States v. Mespoulede,* 597 F.2d

simply has not carried the substantial burden of showing that these factual issues were necessarily determined in the earlier trial. *See United States v. Giarratano,* 622 F.2d 153, 156 n. 4 (5th Cir.1980); *United States v. Barket,* 530 F.2d 181, 188 (8th Cir.1975), *cert. denied,* 429 U.S. 917, 97 S.Ct. 308, 50 L.Ed.2d 282 (1976).

**B**

We find no merit in Head's contention that because prosecutorial misconduct induced the trial court error leading to reversal of his first trial conviction, his second conviction should now be set aside. We need go no further than to reject the premise that there was any prosecutorial misconduct in the respect claimed.

■■■ The specific contention is that after originally requesting an instruction on the statute of limitations defense to the conspiracy count, the government later successfully objected to the giving of such an instruction. It is claimed that this was for the purpose of inducing error. We have carefully studied the record and are satisfied that the government's reversal of its position reflected no more than a failure of communication within its prosecutorial team and not any manipulative or knowing effort to induce error. Indeed, as we noted in our earlier opinion, "even counsel for the government expressed bewilderment at the court's ruling" on the statute of limitations instruction. *United States v. Head,* 641 F.2d 174, 177 n. 3 (4th Cir.1981).

**C**

As earlier indicated, *see supra* Part II C, Head's attack on the conspiracy count of the indictment for duplicitousness was premised upon his more fundamental contention that collateral estoppel precluded proof of the tax object of the conspiracy. Without suggesting that if the premise

were established the contention of duplicitousness would prevail, it suffices to note that the premise has been rejected. *See id.* With this premise falls any contention that conviction on the conspiracy count must now be reversed for duplicitousness of the indictment.

**IV**

Head relies heavily upon a contention that the trial judge's overall conduct of the trial so prejudiced him that in total compass it deprived him of due process. The most casual inspection of the record discloses that this serious charge is one not lightly nor irresponsibly advanced by Head's counsel. Nevertheless, we are persuaded upon a careful review of the record that the conduct relied upon did not deny to Head his right to "a fair, as distinguished from a perfect, trial." *United States v. Robinson,* 635 F.2d 981, 984 (2d Cir.1980), *cert. denied,* 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981).

Because of the nature of the contention, it merits some discussion rather than unelaborated rejection. It may properly be treated as containing two elements: a general pattern of conduct whose overall effect must have been to convey to the jury a sense of the trial judge's bias against Head or Head's defense; and several specific rulings and acts that unmistakably and without any attempt at mitigation or correction must be ascribed that effect in addition to the direct prejudice resulting from them.

We treat these separately.

**A**

Relying on our decision in *United States v. Cole,* 491 F.2d 1276 (4th Cir.1974), which, he contends, involved much the same pattern of prejudicial conduct of a trial, Head identifies a general mosaic of harmful in-

329 (2d Cir.1979); *Phillips v. United States,* 502 F.2d 227 (4th Cir.1974), *vacated on other grounds,* 518 F.2d 108 (4th Cir.1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1483, 47 L.Ed.2d 747 (1976). In *Mespoulede,* for instance, the defendant's acquittal on a count alleging possession of cocaine was held to preclude relitiga-

tion of the possession issue in a subsequent trial where the defendant was charged with conspiracy to distribute cocaine. Unlike Head's acquittals, however, it was apparent that the defendant's acquittal in *Mespoulede* was based entirely upon the jury's factual determination regarding possession.

terventions and commentary by the trial judge which, he argues, had a "cumulative effect ... so pervasive and prejudicial that the verdicts cannot stand," *id.* at 1279. Indeed, he claims to have identified in the record a total of 2,470 interjections by the trial judge over the course of the five-day trial, interjections that demonstrably include the berating of witnesses and counsel, the making of frequent *sua sponte* objections to counsel's presentation of the case, and extensive cross-examination of witnesses.

 We have not attempted to verify the exact accuracy of this count whose exactness is, in any event, beside the point. It suffices to acknowledge, as we must with the charge responsibly laid before us, that there was in this trial a distressingly frequent exercise of the trial court's undoubted discretionary prerogative—and duty, on appropriate occasions—to intervene *sua sponte* in the proceedings in order to control them.

That some of the interventions were wholly appropriate under the most restrained exercise of the prerogative is clear. That some may even have been induced by deliberate trial tactics is a possibility so patent upon the record that it must be acknowledged in any fair reckoning of cause and effect. After these are conceded, however, the impression remains of a degree of trial judge intrusion that far exceeded the bounds of the model of judicial control of trials rightly aspired to in our adversarial system.

 But we review for prejudicial trial court error in the specific case and not, except in the most occasional exercise of our supervisory powers, generally to police the conduct of trials against some general model of judiciousness. And here the specific prejudice suggested is that the overall pattern of intrusions necessarily communicated to the jury such an impression of partiality and outright advocacy on the judge's part that they must have been taken to reflect an underlying belief that the defendant was guilty.

 Reviewing the record for that limited purpose we cannot ascribe prejudice to the defendant's fair trial rights from the overall pattern of interventions. A proper view of the matter is, we think, that recurring demonstrations of apparent partiality and disfavor were distributed between the government and the defendant with remarkable, though purely random, evenhandedness—if without a consistent and informed judiciousness. As the government has wryly pointed out in its brief and on oral argument, it could have come off no better than the defendant in the eyes of a jury seeking guidance from the trial judge's apparent degree of favor or disfavor for one side or the other. The judge directed negatively toned remarks at both sides and at counsel for both sides, *see United States v. Johnson,* 657 F.2d 604, 605 (4th Cir.1981); his frequent asides and his patent overinvolvement in the examination of witnesses cut both ways with an overall impartiality that defies any fine-tuned balancing of harms from the probable impressions conveyed to the jury. Considered in their totality, they probably only conveyed an impression of general irritation and impatience with counsel for both sides and with the whole course of the proceedings.

In sum, the record "neither disclose[s] actual bias on the part of the trial judge nor [does it leave us] ... with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality." *United States v. Singer,* 687 F.2d 1135, 1141 n. 10 (8th Cir.1982). For this reason, we find no merit in the contention that prejudice resulted from the overall pattern of the trial judge's conduct of the trial.

B

We turn now to several more specific instances of intervention by the trial judge that Head contends prejudiced him both through the general impression of bias they must have conveyed to the jury and their directly adverse effects.

**(1)**

■ Seeking to discredit the critical testimony of Elko as a government witness, Head attempted by cross-examination to establish that Elko was motivated both by a desire for leniency and by resentment at Head's failure to assume Elko's legal expenses. Specifically, he attempted to bring out that Elko had voluntarily made incriminating statements about Head in the prosecutor's office shortly before Elko was to be sentenced for his own conviction.

In a series of rulings that the government candidly concedes were based upon misconstruction both of the relevant facts and the law, the trial judge prevented this line of questioning, commenting erroneously that "Elko said he never cooperated [and he] was immunized, and required by law to testify."

Taken in isolation, this ruling seemingly damaged Head's ability to attack Elko's testimony. Taken in context of the entire trial, however, we agree with the government that the factual elements tending to discredit Elko on the basis of his bias and motivation were otherwise sufficiently established in the record. During cross-examination, Elko admitted both that he sought a reduction of his pending sentence, and that his conversations about Head with federal prosecutors began soon after Head refused to pay $8,000 for legal expenses.[16] If there was error in excluding this line of questioning, it was harmless.

**16.** The trial court also refused to admit into evidence an affidavit executed by Assistant United States Attorney Hinden related to a phone conversation between Hinden and government prosecutor John Dowd concerning conversations between Dowd and Elko. Head contends that this affidavit was erroneously excluded by the trial judge on the theory that it was not an admission by a party-opponent and that it would have shown Elko's volunteering of information about Head in order to obtain leniency from the government. Whether or not the affidavit was properly admissible, Elko's testimony on cross-examination that he sought leniency from the government makes the Hinden affidavit merely cumulative on this point.

**17.** Head claims as well that his attempts to show Elko's prior inconsistent statements were

**(2)**

■ In addition to attacking Elko's bias and motivation, Head sought to confront Elko with numerous prior inconsistent statements. Again, Head's efforts were at least partially frustrated through interventions and rulings by the trial judge, particularly when the court refused to allow Head to pursue a line of inquiry that attempted to establish Elko's knowledge and approval of two FBI reports.[17] The report set forth an interview between Elko and the FBI, and revealed several significant inconsistencies with Elko's trial testimony. The trial judge, however, refused *sua sponte* to allow Head either to question Elko about the FBI report or to allow the FBI agents to use the report to refresh their recollection of this interview.

Government counsel attempted to persuade the trial judge to reverse his rulings on the use of the FBI reports, and ultimately agreed to a stipulation regarding the contents of the reports. Head argues, though, that this was insufficient to remedy the trial judge's prior interference, because government counsel would not agree to language in the stipulation that the "United States Attorney attaches significance to the high reliability and accuracy of these reports." We find no merit in this argument; the trial court emphasized to the jury that the stipulation had to be accepted as true.[18]

**(3)**

■ Head contends that his own credibility was the other most glaring casualty frustrated by the trial court's refusal to admit the Hinden affidavit. *See supra* note 16. In fact, however, Elko admitted the contents of this affidavit during his cross-examination—noting that the newspapers had released the information—but denied making the statements ascribed to him. The credibility issue was thus put squarely before the jury.

**18.** Moreover, omission of this language could at most have caused minimal damage to Head's efforts at attacking Elko's credibility on the basis of prior inconsistent statements. There are numerous instances in the record where defense counsel was able to expose inconsistencies between Elko's testimony and his prior statements. In addition, the trial court made clear to the jury that Elko had been convicted of perjury.

of the trial judge's interventions and revealed misapprehensions. He cites examples where the trial court's interference in the presentation of witnesses—such as during the defense's direct examination of Head and accountant Thomas—allegedly caused the testimony to lose coherence. Moreover, Head argues that he was subjected to cross-examination by the trial judge during his direct testimony, and that his cross-examination must have appeared to be a partnership between the court and the prosecution.

Our examination of the record does not support Head's contentions that the testimony of any of his witnesses became disjointed due to trial court interference. "Although [the trial judge] frequently interrupted witnesses or counsel and sometimes asked questions, his obvious purpose in most instances was to clarify ambiguities or questions raised by the witness' testimony or the counsel's interrogation, which is permissible." *United States v. Robinson,* 635 F.2d 981, 986 (2d Cir.1980), *cert. denied,* 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981). By the same token, the questioning by the trial judge during Head's direct examination was aimed at clarifying testimony on a series of somewhat bewildering transactions, and did not amount to improper cross-examination.

Finally, we find unsupported by the record the argument that the trial court's frequent interventions made cross-examination of Head appear to be a partnership between judge and prosecutor. The trial court's interventions during Head's cross-examination were primarily of two stripes: attempts to clarify Head's testimony and critical admonitions to the prosecutor. In no realistic sense could this have projected to the jury any impression that the judge had abandoned his rightful role and joined the prosecutor.

## V

Head challenges a series of rulings and events occurring at the jury deliberations stage of the proceedings.

### A

█ First, Head complains of the trial court's refusal to give requested instructions pertaining to Head's reliance on bookkeepers and accountants as a defense to the tax object of the conspiracy and to his claimed withdrawal from the conspiracy.

The trial judge refused to give the reliance instruction because in his view it lacked a factual basis in the record. Whether or not this factual assessment was correct, Head was not damaged by the trial court's refusal to give this instruction. The jury instructions emphasized at great length the requirement that there be a willful intent to evade taxes, including that the government had to show Head had "attempted to evade or cause[d] to be defeated" taxes due. Even assuming there was a factual basis for the reliance instruction, we cannot say it would have added appreciably to the jury's understanding of the intent requirement nor of Head's specific theory of defense addressed to it. *See United States v. Stone,* 431 F.2d 1286, 1289 n. 9 (5th Cir.1970), *cert. denied,* 401 U.S. 912, 91 S.Ct. 879, 27 L.Ed.2d 811 (1971).

Our review of the record similarly discloses no sufficient evidentiary basis for the requested withdrawal instruction. *See United States v. Boyd,* 610 F.2d 521, 528 (8th Cir.1979), *cert. denied,* 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980).

### B

█ Second, Head contends the trial court engaged in "verdict urging," *see United States v. Flannery,* 451 F.2d 880, 883 (1st Cir.1971); *United States v. Diamond,* 430 F.2d 688, 695–97 (5th Cir.1970), by telling the jury that they should choose whether to continue deliberating for another half-hour or to go home immediately and return in the morning.[19] Even though the jury did choose to continue its deliberations and soon

---

**19.** The precise remarks were as follows:

"I will say I don't want to rush you in the slightest. I will stay if any of you want to

.... I want to be satisfied without rushing any of you. If you can reach a verdict by 6:00 o'clock [then continue your delibera-

returned a verdict, we find no reversible error in the trial judge's comments at this stage because he emphasized repeatedly that he was not rushing the jury or placing them under any time constraint.

## C

Third, Head urges that his rights under Rule 43 were violated by the handling of an exchange of communications between the judge and jury. After sending the jury back to ponder whether to continue its deliberations, the trial judge received a note from the jury. Without reading the note or entering it formally into the record, the judge revealed to counsel its essential contents: that the jury had decided on two counts and had hung on a third. This of course signalled jury confusion, there being but two counts. The judge solicited advice from counsel, then responded with a note of his own, again without reading it into the record although he made clear its import: that he would take a unanimous verdict on either Count One or Two.

This procedure did not violate the requirements of Rule 43, see *Rogers v. United States,* 422 U.S. 35, 39, 95 S.Ct. 2091, 2094, 45 L.Ed.2d 1 (1975), because the contents of the notes, even if not the precise wording, were revealed to counsel, and, more importantly, because the notes dealt not with substantive questions or supplemental jury instructions but rather only informed the judge and jury regarding the state of deliberations.

Finally, Head asserts that prejudicial error arose from what he terms "totally inadequate" efforts by the trial judge to resolve the jury's apparent confusion about whether there were two or three counts at issue. Contrary to Head's contention, the record demonstrates that great care was taken during deliberations to ensure and clarify the jury's understanding of the counts of the indictment.

## VI

Head advances as well a welter of additional contentions: *inter alia* that the evidence was insufficient to support the jury verdicts; that the judge erred in refusing to inquire on *voir dire* concerning the venire's attitudes on birth control; that the court erred in refusing to question veniremen individually *in camera* regarding their exposure to pretrial publicity; and that there was prejudicial error arising from the court's failure to poll the jury about newspaper articles appearing during the trial. We have carefully examined all these arguments and find them without merit.

## VII

The judgment of the district court is affirmed.

AFFIRMED.

tions], otherwise, I prefer you go home now and come back tomorrow morning because I want you to take your time. Let me know what you want to do .... I want to make sure I am not rushing anyone. If you want to go home, then [return] tomorrow morning at 10:00 o'clock and then you can take all the time you want."