Arthur Garland HESS, Appellant,

v.

Travis MEDLOCK, Attorney General of the State of South Carolina; William D. Leeke, Commissioner of the South Carolina Department of Corrections; and the State of South Carolina, Appellees.

No. 86–7555.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 2, 1987.

Decided June 19, 1987.

J. Marvin Mullis, Jr., Columbia, S.C., for appellant.

Frank L. Valenta, Jr., Asst. Atty. Gen. (T. Travis Medlock, Atty. Gen., Donald J. Zelenka, Chief Deputy Atty. Gen., Columbia, S.C., on brief), for appellees.

Before HALL, PHILLIPS, and WILKINSON, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Arthur G. Hess appeals the denial of his Petition for a Writ of Habeas Corpus. Although Hess's federal habeas petition alleges seven grounds for relief, only one, a charge that his successive prosecution by two South Carolina state courts offends the Double Jeopardy Clause, provides an arguable basis for granting the petition. This charge raises a number of complicated constitutional issues and even more complicated questions concerning exactly what the two South Carolina juries actually decided. To assist us in the necessary double jeopardy analysis, we had the record supplemented with copies of the two indictments and the complete trial transcripts of the two trials. We have reviewed this supplemental material and conclude that Hess's constitutional rights were not infringed by the course of prosecution in the South Carolina courts.

I

The rather complicated history of this § 2254 petition began when Joel A. Hendrix approached the Attorney General of the State of South Carolina through his attorney to report that Arthur G. Hess, then Chief of Police of Columbia, South Carolina, had solicited a bribe. Hendrix reported that after several preliminary phone calls from Hess, the two met at a rest stop on Interstate Highway 26 in Calhoun County, South Carolina on October 11, 1980, where Hess offered to supply him with information and "advice" for $1,000 per month. Hendrix owned several businesses in Columbia, including the Carolina Amusement Co., and advised other businesses which used his juke boxes, pinball machines, video games and pool tables. Hess, at least, also believed him to be a major local crime figure. The information Hess offered concerned ongoing police investigations in Columbia in which Hendrix might have some interest; the "advice" concerned how to stay out of jail.

Hendrix's story understandably interested the Attorney General, and when the two men met after October 11 it was under the

watchful eye of the South Carolina State Law Enforcement Division (SLED). With SLED's guidance, Hendrix arranged another meeting at the I-26 rest stop in Calhoun County to discuss "arrangements." For this second meeting, SLED provided Hendrix with $1,000 in marked currency and a hidden microphone and transmitter. SLED also arranged to videotape the two men.

On October 18, the second Calhoun County meeting occurred as arranged and Hess accepted the marked $1,000. The apparent quid pro quo was two pieces of information. The first consisted of general information regarding possible investigations of clubs in which Hendrix had an interest and some specific advice on how Hendrix could relocate some of his activities to minimize police interference. The second piece of information concerned an ongoing undercover operation. According to Hendrix, at the unrecorded October 11 meeting Hess reported that the Columbia Police Department was investigating the J & J Grocery, that an undercover officer was in place, and that Hendrix would be wise to remove his machines. Hendrix admitted passing the information along to the J & J's manager. At the recorded and photographed October 18 meeting, Hess asked Hendrix whether he had removed his machines from the J & J Grocery and told Hendrix that federal agents had entered the investigation. These informative recorded remarks, and the state's later showing that the J & J Grocery investigation had ended when the manager revealed her suspicion of the undercover agent on October 14, circumstantially confirmed Hendrix's account of the first meeting.

Despite its thorough documentation of the October 18 meeting in Calhoun County, SLED continued its investigation. Subsequent meetings between Hess and Hendrix in Lexington County, South Carolina, resulted in evidence of other specific pieces of information passed along in exchange for further cash payments. The SLED investigation ended when Hess was arrested shortly after he allegedly received $3,000 from Hendrix at the Family Mart, a large store in West Columbia (in Lexington County) on January 3, 1981. This final

meeting, unlike the earlier rendezvous at the I-26 rest stop, was imperfectly documented and the $3,000, which Hess never admitted receiving, was not recovered until after his trial.

Because of South Carolina venue rules for criminal cases, and the absence of any state rule requiring the joinder of charges arising out of the same course of illegal activity, Hess was indicted in both Lexington and Calhoun counties. On April 20, 1981, a Lexington County grand jury indicted Hess on six counts for the acts occurring in that jurisdiction. Counts One and Two charged Hess with bribery and extortion, alleging Hess's acceptance of the $3,000 at the January 3 meeting. Counts Three and Four charged Hess with obstruction of justice for allegedly informing Hendrix on October 31 of a possible narcotics investigation involving Hendrix and for warning Hendrix about an investigation of one Jack Skenes. These counts alleged that the information passed to Hendrix obstructed justice as part of a "common scheme, design, plan and agreement" to protect Hendrix and reveal information about police investigations. Counts Five and Six charged Hess with misconduct in office (official misconduct), the first for informing Hendrix of the possible narcotics investigation and the second for informing him about an investigation by the Federal Alcohol, Tobacco and Firearms Agency into a fire at an establishment in which Hendrix had a business interest as well as for "corruptly informing" him of an investigation "into the business or activities of one Jack Skenes."

Hess was tried in Lexington County in June 1981. Hess did not deny repeatedly meeting and phoning Hendrix after October 11, 1980, but insisted that his plan was to lure Hendrix into acts of bribery which he could then use to prosecute him. Hess claimed that he informed no other local police officers about his plan because he feared that some of them were corrupt and that Hendrix had "connections" in the Columbia Police Department who would thwart Hess's plan. Hess denied receiving the $3,000 at the January 3 meeting and

denied offering Hendrix any advice or information about police investigations except information he knew to be incorrect or unimportant. The state countered Hess's explanation through the testimony of Hendrix and testimony by SLED investigators who followed the meetings between the two men. The state also presented the well-documented evidence of the October 11 meeting in Calhoun County to show that Hess's intentions were less than honorable.

On June 27 the Lexington County jury acquitted Hess on the bribery, extortion, and obstruction of justice counts, but convicted him on both counts of criminal misconduct in office. The court sentenced Hess to one year of confinement on Count Five, with a concurrent one-year sentence on Count Six.

While the Lexington County prosecution was underway, a Calhoun County grand jury indicted Hess on May 21, 1981, for the events which occurred at the I-26 rest stop in Calhoun County on October 11 and October 18, 1980. The grand jury indicted Hess on four counts. Counts One and Two charged Hess with accepting a bribe and extortion on the basis of the marked $1,000 Hess received on October 18. Count Three charged Hess with obstructing justice "by revealing to Joel A. Hendrix that the Columbia Police Department had or was investigating possible illegal activities at the J & J Grocery...." Count Four charged Hess with misconduct in office for revealing "possible investigations by the Columbia Police Department concerning clubs that Joel A. Hendrix had an interest in, and also [advising] Joel A. Hendrix as to how to operate his clubs and where to locate them in order to avoid possible police interference."

The Calhoun County trial began in November 1981. In this second prosecution, the state enjoyed the obvious benefit of the meticulously recorded and photographed October 18 meeting. Hess admitted accepting $1,000 and arranging future payments at the October 18 meeting, but repeated his story of a secret one-man covert investigation. Hess insisted it was Hendrix who raised the subject of the J & J

Grocery investigation at their first meeting, and claimed he did not believe the investigation sufficiently important to make inquiries about it within the police department after Hendrix's comments. Hess also insisted that his advice to Hendrix on avoiding future police interference was deliberately designed to frustrate, not further, Hendrix's criminal enterprises.

On November 20, 1981, the Calhoun County jury acquitted Hess on the bribery and extortion counts, but found Hess guilty of obstruction of justice and misconduct in office. The trial judge sentenced Hess to three years incarceration on the obstruction of justice count and one year on the misconduct in office count, with the two sentences to be served concurrently.

Hess directly appealed both his Lexington County and Calhoun County convictions to the South Carolina Supreme Court. In *State v. Hess (Hess I)*, 279 S.C. 14, 301 S.E.2d 547 (1983), the court rejected Hess's argument that his first conviction had to be vacated because the Lexington County jury necessarily accepted his story that he planned to "set up" Hendrix when it acquitted him of bribery, extortion, and obstruction of justice. Its subsequent conviction of him for misconduct in office, he argued, was improperly based on his "mere negligence" in pursuing his investigation. In a brief opinion, the court noted that the trial judge had instructed the jury that official misconduct requires "corrupt intent" and concluded that the evidence was sufficient for the jury to reject Hess's story "that his intentions were wholesome even though his methods were unorthodox." 301 S.E.2d at 549.

In *State v. Hess (Hess II)*, 279 S.C. 525, 309 S.E.2d 741 (1983), the South Carolina Supreme Court affirmed in part and vacated in part the Calhoun County conviction. Hess presented the court with some 61 exceptions grouped in 24 questions. The most difficult question before the South Carolina Supreme Court, and the only difficult question before us, was whether the Calhoun County prosecution offended the Double Jeopardy Clause, including the principles of criminal collateral estoppel. Hess

pointed out to the court that the state had presented evidence of the Calhoun County meetings in the earlier Lexington County prosecution, apparently to show Hess's intent or motive, and that the Lexington County jury had acquitted him on two obstruction of justice counts and convicted him of misconduct in office before he was tried on similar charges in Calhoun County.

The court agreed with Hess to the extent of vacating his second conviction for misconduct in office. The court concluded that criminal misconduct in office could consist of a continuing series of acts, and that the Lexington County prosecutor had in fact characterized Hess's actions as a single course of misconduct rather than as separate illegal acts, so that Hess's second prosecution represented a second trial for the "same offense." The court refused, however, to apply the same analysis to the different crime of obstruction of justice, which, the court concluded, "presents a distinct complex of issues from that of misconduct in office." 309 S.E.2d at 743. The court went on to note that even if the Calhoun County prosecution for obstruction did not represent a second trial for the "same offense" the state might still be barred from reprosecution by principles of criminal collateral estoppel. The court concluded, however, that the first jury in Lexington County did not *necessarily* decide any issue that might bar the subsequent Calhoun County verdict. Accordingly, the court affirmed the second conviction for obstruction of justice.

After the South Carolina Supreme Court denied Hess's petition for rehearing in *Hess II*, he unsuccessfully filed a petition for a writ of certiorari with the United States Supreme Court. 464 U.S. 995, 104 S.Ct. 490, 78 L.Ed.2d 685 (1983). Hess filed this federal petition for a writ of habeas corpus on October 20, 1983. Hess's § 2254 petition alleged seven grounds for relief, including the same double jeopardy arguments offered on direct appeal to the South Carolina Supreme Court. On April 24, 1985, United States Magistrate Charles W. Gambrell issued a thorough and meticulous Recommendation, concluding that the petition should be denied. On February 21,

1986, the United States District Court for the District of South Carolina approved the Magistrate's Recommendation and denied Hess's petition. This appeal followed.

## II

██ The Double Jeopardy Clause of the fifth amendment provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." At its most basic, the Double Jeopardy Clause provides three related guarantees for criminal defendants: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). These double jeopardy protections apply in state as well as federal prosecutions. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). The South Carolina Supreme Court agreed with Hess that the second of the basic protections identified in *Pearce* was implicated by his Calhoun County prosecution for misconduct in office, and the court vacated that portion of his conviction. Hess argues here that the first, the guarantee against reprosecution "for the same offense" after acquittal, was violated by his second prosecution for obstruction of justice.

The relevant inquiry is whether the Calhoun County jury convicted Hess of the "same offense" for which the Lexington County jury acquitted him. We look first to the two indictments, and note an obvious difference between them: each indictment alleges only acts of obstruction occurring within that jurisdiction. Given the wording of the Lexington County indictment, the Lexington County jury *could not* have convicted Hess for passing along information about the investigation of the J & J Grocery, and for that reason alone we might conclude that Hess was not tried in Calhoun County for the "same offense."

■ As this court has noted, however, the artful phrasing of an indictment cannot frustrate the protections of the Double Jeopardy Clause when the putatively "different offenses" are properly characterized as a single continuing one. *Jordan v. Commonwealth of Virginia*, 653 F.2d 870 (4th Cir.1980). We must be sure that although the two prosecutions ostensibly required proof of different facts, they did not nevertheless involve two criminal prosecutions for a single course of illegal conduct properly characterized as a single offense.

The South Carolina Supreme Court respected this principle when it vacated the second conviction for misconduct in office. The court reasoned that despite the different wording of the indictments, Hess breached a single duty to the public through his separate improper acts. The court then concluded that Hess's official misconduct was a single continuing offense which could support only a single conviction.

■ The common law crime of obstruction of justice, however, does not characterize a course of "obstructive acts" as a unitary offense. This crime is committed whenever a defendant intentionally performs *"any act* which prevents, obstructs, impedes, or hinders the administration of justice." *State v. Cogdell*, 273 S.C. 563, 257 S.E.2d 748, 750 (1979) (emphasis added) (affirming a public official's conviction on twenty-one counts of obstructing justice for repeatedly refusing to report traffic convictions as required by law). Because the common law defines the crime in terms of individual obstructive acts, the state can charge those acts as "separate offenses" in separate counts in a single trial, or in separate trials, without violating the double jeopardy principles outlined in *Pearce.*

■ Our analysis of Hess's claim would be at an end if *Pearce* defined the full range of double jeopardy protections for criminal defendants. However, the principle of collateral estoppel provides an important addendum to *Pearce*'s protections. Even if separate prosecutions do not technically involve the "same offense," the initial trial may litigate and decide issues in the defendant's favor which cannot be relitigated in subsequent trials.

In *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), the Supreme Court held that principles of collateral estoppel which had applied to federal prosecutions since *United States v. Oppenheimer*, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161 (1916), were "embodied in the Fifth Amendment guarantee against double jeopardy." 397 U.S. at 445, 90 S.Ct. at 1195. The Court in *Ashe* reversed the conviction of a defendant prosecuted twice for involvement in the armed robbery of six men. At his first prosecution, for the robbery of one of the men, the defendant's sole defense was that he was not the masked robber and the jury acquitted him. The Court in *Ashe* easily determined that the first jury necessarily accepted the defendant's sole defense, so that a reprosecution for the robbery of the other victims impermissibly required him to " 'run the gantlet' a second time." 397 U.S. at 446, 90 S.Ct. at 1195.

The principle of collateral estoppel provides a significant inducement to state prosecutors to join related prosecutions even if they do not involve the "same offense." *Ashe*'s reach, however, is narrower than it first appears as most defendants cannot carry the "substantial burden of showing that [the] factual issues [which were relitigated] were *necessarily determined* in the earlier trial." *United States v. Head*, 697 F.2d 1200, 1209 (4th Cir.1982) (emphasis added).

■ Mindful of our obligation to determine if the Lexington County jury "necessarily determined" any facts that foreclosed Hess's prosecution in Calhoun County, we have carefully examined "the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter" in order to decide whether a rational Lexington County jury "could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Ashe*, 397 U.S. at 444, 90 S.Ct. at 1194. Our focus is on those issues of ultimate fact

which Hess claims were actually litigated and decided in Lexington County.

Hess argues that when the Lexington County jury acquitted him of all counts except misconduct in office, it *necessarily* accepted his story that he was merely attempting to ensnare Hendrix. We note in passing that the state could make a colorable argument that since the two prosecutions were not for the "same offenses," a jury's finding that Hess lacked the necessary intent for a conviction in Lexington County would not necessarily bar relitigation of intent in Calhoun County. The Lexington County prosecutor, however, presented evidence of the Calhoun County meetings at the I–26 rest stop precisely to assist him in proving intent. If, then, the Lexington County jury necessarily accepted Hess's story, the state should not be permitted to convince a second jury to reject it.

We conclude that the Lexington County jury did not "necessarily decide" that Hess lacked the requisite intent to obstruct justice, and we can explain this conclusion in two fundamentally different ways. The first explanation is the one offered by the South Carolina Supreme Court: since the Lexington County jury convicted Hess of misconduct in office, it could not have accepted his story of legitimate intentions. The indictment itself charged Hess with "corruptly inform[ing]" Hendrix of the various matters. The trial judge recited the indictment's reference to "corrupt intent," then instructed the jury that "[m]isconduct includes any act, any omission, in breach of duty of public concern by persons in public office *provided it is done wilfully and dishonestly.*" Given the jury's decision to convict Hess of official misconduct following this instruction, Hess cannot plausibly argue that the Lexington County jury "necessarily decided" that he lacked the requisite intent for the other offenses. Even if the verdicts of acquittal on the bribery, extortion, and obstruction of justice counts could not be explained without assuming that the jury did not find the requisite intent, the inconsistency of the verdicts on the issue of intent would mean that the jury did not *necessarily* accept Hess's story. *See, e.g., United States v. Price,* 750 F.2d 363 (5th Cir.1985).

There is also a second reason why the principles of *Ashe* did not protect Hess in his second trial. In *Ashe,* the defendant's sole defense at his initial trial was that he was not one of the armed robbers. For that reason, the Court could confidently state that "[t]he single rationally conceivable issue in dispute before the jury was whether the petitioner had been one of the robbers." 397 U.S. at 445, 90 S.Ct. at 1195. Hess, however, did not defend himself before the Lexington County jury solely on the basis of benign intent. Specifically, he denied accepting the $3,000 at the Lexington County Family Mart and denied giving Hendrix any information that "obstructed" justice. Since the bribery and extortion counts depended on the jury's finding that Hess accepted the $3,000, and the obstruction of justice count depended on the jury's finding that the enumerated acts actually obstructed justice, the Lexington County jury may well have concluded that the state failed to prove anything *except* Hess's corrupt intent. The Calhoun County jury, then, was free to relitigate the issue of intent as it applied to the separate offenses occurring in that jurisdiction, and free to decide that Hess intentionally obstructed justice by conveying information about the J & J Grocery undercover investigation.

### III

The remaining issues presented in Hess's Petition require only scant comment. Three of the errors Hess alleges—that first the prosecutor and then the trial judge appealed to regional prejudice and that the trial judge impermissibly restricted the presentation of the defense—are not fairly supported in the record. Hess's objection to "inconsistent verdicts" by the Calhoun County jury overlooks the clear case law allowing inconsistent verdicts to stand in criminal prosecutions. *See United States v. Powell,* 469 U.S. 57, 66, 105 S.Ct. 471, 477, 83 L.Ed.2d 461 (1984) ("The fact that the inconsistency may be the result of lenity, coupled with the government's inability to invoke review, suggests that incon-

sistent verdicts should not be reviewable"). Although Hess argues in his Petition that the trial court improperly failed to dismiss certain counts in the indictment because there was no preliminary hearing, he does not respond to the Magistrate's adverse Recommendation and does not even argue the question in his brief. Finally, Hess argues that the South Carolina Supreme Court was obligated to hold an evidentiary hearing to consider "newly discovered evidence" that might support his motion for a new trial. Although Hess's brief never explains the basis for this claim, the so-called "after discovered evidence" apparently consists of his unsubstantiated belief that a single word was misstated in a twenty-page transcription of an audio recording. The transcription was never introduced into evidence.

Because we conclude that these remaining allegations of error are patently without merit, and that the arguable double jeopardy violation is not supported by a careful reading of the record, we affirm the district court's denial of Hess's petition.

AFFIRMED.