**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

GEORGE B. GODWIN, JR.,
*Defendant-Appellant.*

No. 00-4094

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

WILLA L. CURRY-ROBINSON,
*Defendant-Appellant.*

No. 00-4520

Appeals from the United States District Court
for the Eastern District of Virginia, at Newport News.
Rebecca B. Smith, District Judge.
(CR-99-32)

Argued: March 2, 2001

Decided: November 27, 2001

Before NIEMEYER, MICHAEL, and KING, Circuit Judges.

Affirmed by published opinion. Judge King wrote the majority opinion, in which Judge Niemeyer joined. Judge Michael wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** Stanley E. Sacks, SACKS & SACKS, Norfolk, Virginia; Terry Noland Grinnalds, Hampton, Virginia, for Appellants. Alan Mark Salsbury, Assistant United States Attorney, Norfolk, Virginia, for Appellee. **ON BRIEF:** Helen F. Fahey, United States Attorney, Norfolk, Virginia, for Appellee.

---

**OPINION**

KING, Circuit Judge:

Defendants George B. Godwin, Jr. and Willa L. Curry-Robinson appeal their convictions and sentences on multiple charges relating to a pyramid scheme that defrauded investors in a purported oil-trading venture. Godwin and Curry-Robinson contend, inter alia, that there was insufficient evidence to support their convictions, that certain evidence was improperly admitted against them, and that their sentences contravene the Sentencing Guidelines. Moreover, they assert that the district court assumed an improper prosecutorial role, denying them a fair trial. For the reasons that follow, we affirm the convictions and sentences.

I.

A.

In April 1999, a grand jury in the Eastern District of Virginia returned a thirteen-count indictment against Godwin and Curry-Robinson. They each were charged with three counts of mail fraud, in violation of 18 U.S.C. § 1341, and one count of conspiracy to commit money laundering under 18 U.S.C. § 1956(h). Additionally, Curry-Robinson was charged with six counts of money laundering, in violation of § 1956(a)(1)(A)(i), and three counts of making false declarations in a bankruptcy case under 18 U.S.C. § 152(3).

In September 1999, after a six-day trial, a jury convicted Godwin and Curry-Robinson on all charges. Curry-Robinson subsequently

moved for a new trial, contending that the judge's questioning of witnesses, particularly during Curry-Robinson's testimony, denied her a fair trial. The district court rejected these allegations, and in March 2000 it denied the motion. On July 6, 2000, the court imposed sentences of sixty months' imprisonment on Godwin and ninety-seven months' imprisonment on Curry-Robinson. The defendants filed timely notices of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## B.

Between 1990 and 1998, Godwin and Curry-Robinson sought investors in Case Oil Corporation, a Virginia entity founded by Godwin.[1] Godwin acted as Case Oil's president, while Curry-Robinson served as its agent. They advised prospective investors that money invested in Case Oil would be used to fund its business operations, including the construction of oil pipelines and the development of oil refineries. The defendants stated in letters to investors that Case Oil was an international business that had liquid assets of more than $40 million and contracts in excess of $250 million.[2] They also claimed that Case Oil had contracts with several countries to construct chemical plants.

---

[1]Pursuant to *Glasser v. United States*, 315 U.S. 60, 80 (1942), and its progeny, the facts are presented in the light most favorable to the Government.

[2]The letters written to prospective investors were signed on different occasions in each defendant's name, and included various representations such as the following:

> Case Oil Corporation is a Corporation in good standing with the State of Virginia and is licensed to do business both, nationally and internationally. Case is currently under contract by several countries to construct Urea and petro chemical plants. We are also suppliers of jet fuel oil to several major air lines. Case boast [sic] confirmed contracts in excess of a quarter billion dollars and liquid assets in excess of forty million.

> You are guaranteed a minimum return rate of three to one on any investment held by case [sic] for a period of one year, and a guarentee [sic] of a minimum return of ten times your investment if held through June 1995.

J.A. 945 (letter dated May 15, 1992 to Ronald Nelson).

Godwin and Curry-Robinson asserted, in written and oral communications with investors, that Case Oil supplied jet fuel oil to several major airlines, that investors would receive an ownership interest in Case Oil, and that the defendants, their family members, and their acquaintances had already made large sums of money from investing in Case Oil.

For example, Curry-Robinson falsely advised prospective investor Artistine Lethcoe-Reid that Curry-Robinson's aunt had made $90,000 from a $2,500 Case Oil investment in a short period of time. Lethcoe-Reid did invest in Case Oil, but when she attempted to retrieve her money, Curry-Robinson offered excuse after excuse. After Lethcoe-Reid indicated that she was desperate for funds for her daughter's wedding, Curry-Robinson promised to meet her and give her money, but failed to appear for the rendezvous. Other investors describe being similarly put off by a multitude of excuses: Curry-Robinson's sister was ill; she had been out of town; she needed permission to cut the check; the check was being processed; the check had not been divided for enough parties; the money had to be transferred in increments for tax reasons; the bank was having trouble handling such a large amount of money; or the money was in, but they were busy distributing it. When investors demanded funds, Curry-Robinson would maintain that the check would be ready "next Wednesday," or "next month," or "in a few days." *E.g.*, J.A. 62, 82, 170, 201, 255, 265, 280, 309, 359, 381, 406. Moreover, the evidence established that Case Oil investors generally had trouble contacting Curry-Robinson, while she promptly returned calls from prospective investors.

Curry-Robinson personally guaranteed the investments in Case Oil, and both defendants represented that such investments would earn interest at high rates of return, typically between 50% and 300% within thirty days to two years from the time of investment. As part of the "guaranteed" investments, Curry-Robinson wrote post-dated checks for investors to hold as security. When an investor attempted to negotiate such a check, however, he would find that it was written on a closed or insufficient funds account. Some investors liquidated legitimate investment holdings in order to generate money to give to Curry-Robinson and Godwin. One investor drew on her grandchildren's savings account, while another lost money intended for her niece. A third investor turned over funds meant to pay off his house,

and yet another, Geoffrey Lawrence, gave Godwin and Curry-Robinson an inheritance from his mother. When Lawrence died, Godwin and Curry-Robinson attended the funeral and both advised his widow, Areather Lawrence, not to worry because she and her daughter would be taken care of. Ms. Lawrence had always been suspicious of her husband's investment in Case Oil, and Curry-Robinson repeatedly assured her that it was "not a scam." When the widow had trouble paying her rent, Godwin wrote letters to her landlord and her prospective housing lender, confirming that Ms. Lawrence was entitled to funds due her husband and promising that money would be forthcoming in thirty days. In reality, Ms. Lawrence received "not one dime" from the defendants after her husband's death. J.A. 139. Curry-Robinson solicited her friends, co-workers, even her ailing hairdresser, to contribute to the fraud scheme. When Curry-Robinson appealed to the hairdresser, Brenda Outlaw, for a second investment, claiming desperate need, Outlaw turned over another $4,000, despite Curry-Robinson's failure to render the promised profit — or even to return the face amount — on the first sum of money invested.

Significantly, the defendants conceded in separate statements to the FBI, which were introduced against them at trial, that (1) Case Oil had no income and essentially no assets, (2) it maintained no books or records, and (3) it had never successfully consummated a business deal. Case Oil's legal address had no facsimile machine, and its sole assets consisted of some documents at Curry-Robinson's residence. Case Oil had never filed an income tax return, and the defendants rationalized this illegal act to the FBI as being due to its failure to make a profit.

An investigating FBI Agent, having reviewed the defendants' bank records, testified at trial that Godwin and Curry-Robinson had not invested any of the money that they had solicited for the benefit of Case Oil, but instead had diverted the funds for their personal use. Case Oil never successfully entered into or brokered a contract for an oil refinery, pipeline, or any other venture. The evidence also demonstrated that funds received from new investors were occasionally used to make "interest" (or, more accurately, "lulling") payments to earlier investors, in order to dispel complaints and to maintain the scheme. On at least three occasions, these lulling payments were made when the investor threatened legal action. Godwin and Curry-Robinson's

conduct in the Case Oil scam, as alleged and as proven to the jury, constituted what is commonly referred to as an illegal pyramid (or Ponzi) scheme.[3] Additionally, Curry-Robinson filed two voluntary personal bankruptcy petitions in which she signed a declaration under penalty of perjury that her answers were accurate. In neither of these petitions did she include the monies she received from investors and kept for herself, nor, in the second petition, did she list her personal financial accounts into which she had deposited those funds. In total, twenty-nine of the thirty-two investors testified as Government witnesses at trial. These investors delivered over $400,000 to Godwin and Curry-Robinson for investments in Case Oil, of which approximately $350,000 was never returned. The defendants obtained investments in part by falsely claiming that contracts and assets belonging to unrelated entities — Case Energy and Case Laboratories — were those of Case Oil Corporation. Rabi Satyal, a purported partner in Case Oil, had prepared documents for an unrelated entity, Case Energy, that were altered to appear to be records of Case Oil. Satyal had not known Godwin and Curry-Robinson were soliciting investors for Case Oil, and he testified that they failed to follow through on the one possible business deal of Case Oil that progressed to the stage of a memorandum of understanding.

The Government presented a total of thirty-two witnesses to prove that Godwin and Curry-Robinson established and carried out the fraud scheme. The essentials of that scheme, however, were not directly challenged by the defense; rather, the defendants claimed they harbored no fraudulent intent, and they focused their defense efforts on an attempt to prove good faith. Both Godwin and Curry-Robinson testified as part of the defense presentation, acknowledging the primary allegations of the Government's case, but denying that they possessed any intention to defraud the Case Oil investors.

---

[3]The term "Ponzi scheme" is the namesake of Charles Ponzi, a renowned Boston swindler, and refers to "a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." *Alexander v. Compton*, 229 F.3d 750, 759 n.1 (9th Cir. 2000) (internal citation and quotation omitted).

## II.

We first address the defendants' assertion that the evidence was insufficient to support their convictions. In reviewing such contentions, it is well established that "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *Glasser v. United States*, 315 U.S. 60, 80 (1942). Thus, if the record reflects that the Government presented substantial evidence from which a reasonable jury could convict, we must uphold the verdict.

## A.

Godwin and Curry-Robinson maintain that the evidence was insufficient to sustain their convictions for mail fraud.[4] The two elements of mail fraud are: (1) the existence of a scheme to defraud, and (2) the use of the mails for the purpose of executing the scheme. *See United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997). For the reasons set forth below, we see the evidence as sufficient to support the jury's verdict, and we therefore affirm the mail fraud convictions.

## 1.

In order to establish the first element, i.e., the scheme to defraud, the Government must prove that the defendants acted with the specific intent to defraud, which "may be inferred from the totality of the circumstances and need not be proven by direct evidence." *United States v. Ham*, 998 F.2d 1247, 1254 (4th Cir. 1993). The evidence demonstrated that for a period of eight years the defendants made a

---

[4]The mail fraud statute, 18 U.S.C. § 1341, provides in pertinent part that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, . . . shall be fined . . . or imprisoned . . ., or both.

series of promises to investors that their investments would be risk-free, guaranteed, and would earn interest at rates of return up to 300%. These terms of investment, which appeared on many written certifications presented in evidence by the Government, were delivered to several of the investors by mail.[5] Significantly, none of these promises were ever fulfilled. Godwin and Curry-Robinson were well aware that they had not honored their prior representations, yet to induce new investments the defendants nevertheless continued to make identical promises in later years. Clearly, there was substantial evidence demonstrating that Godwin and Curry-Robinson solicited and accepted money from others for investment purposes, that in fact no investments occurred, and that the defendants appropriated the investors' money for their personal use and benefit. Furthermore, when Case Oil investors complained, Godwin and Curry-Robinson made partial refund payments, using money from subsequent investors to quiet the protests and to continue the fraud scheme.

Both Godwin and Curry-Robinson maintain that they did not engage in a scheme to defraud because they always acted with the good-faith belief that Case Oil would be successful and that they would, in turn, be able to provide their investors with substantial financial returns. Curry-Robinson asserted that she invested her own assets in Case Oil, and that this activity indicates she had no intent to defraud. Regardless of whether Curry-Robinson invested her own money, however, she represented to investors that their money was for investment in Case Oil, while using it to "reimburse" herself or others who had invested previously.

Viewing this evidence in the light most favorable to the Government, a reasonable jury could conclude that the defendants engaged in a scheme to defraud, and that they carried it out by use of the mails. Furthermore, a reasonable jury could conclude that even if Godwin

---

[5]For example, the certificate of one of the testifying investors, Rita Jackson, dated July 13, 1996, listed a return date of December 30, 1996, followed by: "I, Willa L. Curry-Robinson do hereby certify that I received on this day, the sum of $2,500 from Rita Jackson for an investment in a certain oil refinery with a return of $5,000." J.A. 932. The return amount appears twice in Ms. Jackson's certification, followed by Curry-Robinson's signature.

and Curry-Robinson had originally harbored good intentions, when their financial expectations soured they engaged in fraudulent activity to placate unhappy investors and prolong their scheme to defraud. Thus, we will not disturb the mail fraud aspects of the jury's verdict on this basis.

2.

Next, Godwin asserts that there was insufficient evidence to sustain his convictions for mail fraud because the evidence did not demonstrate that he caused the mailings charged in Counts One and Two, and because the mailing in Count Three did not further the fraudulent investment scheme. Godwin asserts that, even if the defendants engaged in a scheme to defraud, the evidence indicates that he did not personally "place" or "cause to be placed" any "matter or thing whatever" in the mail. Godwin's reasoning is unpersuasive, however, given the broad meaning we must accord to the term "cause" in a mail fraud prosecution. The Supreme Court has held that "where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *United States v. Pereira*, 347 U.S. 1, 8-9 (1954); *see also United States v. Snowden*, 770 F.2d 393, 397 (4th Cir. 1985).

The specific mailings in Counts One and Two were certifications signed by Curry-Robinson on behalf of Case Oil and sent, respectively, to investors Virginia Patterson and Rita Jackson. These certifications acknowledged the receipt by Case Oil of monies from Patterson and Jackson for investments in an oil refinery, and set forth the terms of the investment, including the sums of money to be returned and the specified return dates. *See supra* note 5. Patterson and Jackson each testified at trial that they received these certifications by mail.

Godwin indisputably knew that Curry-Robinson was soliciting and receiving monies from investors, and a reasonable jury could find that he knew, or reasonably should have foreseen, that use of the mails would follow.[6] We view the evidence as entirely sufficient to support Godwin's conviction on Counts One and Two.

---

[6]Moreover, Godwin is liable under an agency theory for mailings in furtherance of the fraud scheme initiated by his agent, Curry-Robinson.

The mailing charged in Count Three is a letter, signed by Godwin, to the landlord of investor Areather Lawrence, advising the landlord that Lawrence was entitled to funds due her deceased husband.[7] After Lawrence complained to Godwin about his failure to make the promised return on her husband's $40,000 investment, Godwin mailed the letter to Lawrence so she could present it to her landlord as proof that she would be able to pay her overdue rent. Godwin acknowledged in his trial testimony that he wrote and mailed the letter to Lawrence. Godwin claims that because the letter simply stated that Lawrence was a beneficiary of her deceased husband, who would be "entitled to all funds due him," it was not mailed in furtherance of any scheme, and its mailing was therefore insufficient proof of mail fraud. This argument, however, is unavailing. As we held in *Snowden*, "lulling letters sent to innocent victims for the purpose of advancing a fraudulent and criminal scheme are sufficient to charge mail fraud." 770 F.2d at 398.

A reasonable jury could well find that Godwin wrote the lulling letter to Ms. Lawrence, an irate investor in Case Oil, in an effort to placate her and to keep the fraud scheme active and ongoing. The evidence was accordingly sufficient to support Godwin's conviction on Count Three.

---

*See United States v. Kenofskey*, 243 U.S. 440, 443 (1917) (stating that principal is criminally liable for mailing by his agent which was reasonably foreseen by principal); *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1402 (4th Cir. 1993) (noting that principal is criminally responsible when he "anticipated and expected" that agents would sell and mail bonds).

[7]The letter to Lawrence's landlord, dated October 25, 1996, reads: "This letter will confirm that Aretha Lawrence is the beneficiary of Geoffrey Lawrence, her husband who recently died. She is entitled to all funds due him from this company when the transaction is completed. We anticipate being able to repay the funds due Ms. Lawrence within the next thirty days." J.A. 939. A letter to her prospective housing lender, dated April 21, 1997, states: "This letter is to advise that Mrs. Lawrence is due certain funds from this company for monies due Geoffrey Lawrence her late husband. We expect the transaction to be complete within the next thirty (30) days." J.A. 941.

B.

The defendants also contest the sufficiency of the evidence used to convict them of conspiracy to launder money, in violation of 18 U.S.C. § 1956(h), as charged in Count Four of the indictment. Their claim of error in this regard must also fail.

The evidence reflected that Godwin was aware that Curry-Robinson paid original Case Oil investors with monies obtained from subsequent investors. It is elementary that a criminal conspiracy, as an inchoate offense, may be proven inferentially and by circumstantial evidence. *See United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996) (noting that conspiracy, being clandestine, results in "little direct evidence," thus it "may be proved wholly by circumstantial evidence"); *United States v. Anderson*, 611 F.2d 504, 510 (4th Cir. 1979) ("Circumstantial evidence of criminal acts may be used inferentially to prove the existence of a conspiracy to commit those acts."). In light of the jury's finding that a scheme to defraud had been proven by the Government, the jury was also entitled to find that this scheme included the "lulling" or "interest" payments described above.

Godwin further protests his money laundering conspiracy conviction on the ground that the record does not show that he committed an "overt act" in furtherance of the conspiracy.[8] This contention is also meritless, however, because only one member of a conspiracy must commit an overt act.[9] *See Anderson*, 611 F.2d at 510. The evidence indicated that Curry-Robinson committed multiple overt acts in furtherance of the conspiracy alleged in Count Four in making the payments charged in the money laundering counts. It is to those charges, Counts Five through Ten, that we next turn.

---

[8]The money laundering conspiracy statute, codified at 18 U.S.C. § 1956(h), provides: "Any person who conspires to commit [money laundering] shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

[9]It is also true, as the Government notes, that a conspiracy under 18 U.S.C. § 1956(h), as opposed to a conspiracy under 18 U.S.C. § 371, does not explicitly require proof of an overt act. *See United States v. Tam*, 240 F.3d 797, 802 (9th Cir. 2001). In any event, overt acts were alleged and proven in this case.

## C.

Curry-Robinson asserts that there was insufficient evidence to convict her of money laundering. She maintains that these counts must fail because the checks she wrote to Case Oil investors did not affect interstate commerce, they did not represent illegal proceeds, and they were not part of the "carrying on of an unlawful activity" as required by 18 U.S.C. § 1956(a)(1)(A)(i).[10] The money laundering charges here relate to "interest" payments made by Curry-Robinson to dissatisfied investors using checks drawn on financial institutions engaged in interstate commerce, e.g., Signet Bank. Because a "financial transaction," pursuant to 18 U.S.C. § 1956(c)(4)(B), needs only to "involv[e] the use of a financial institution which is engaged in . . . interstate . . . commerce," the involvement of Signet Bank satisfies the interstate commerce prong of § 1956(a)(1)(A)(i).

In order to convict Curry-Robinson on these charges, the Government was also required to prove that she knew the transactions involved the proceeds of an unlawful activity (in this case the fraud scheme), and that she intended the transactions to promote the carrying on of that unlawful activity. *United States v. Wilkinson*, 137 F.3d 214, 220 (4th Cir. 1998). Viewing the evidence in the light most favorable to the Government, the jury reasonably could have concluded that Curry-Robinson was intimately involved in the scheme to defraud, and that she knew that the money she accepted from subsequent Case Oil investors (and then disbursed portions of to earlier investors) was the proceeds of the fraud scheme. "[W]hen proceeds are used in a transaction to commit the next step in a scheme to

---

[10]The offense of money laundering is governed by § 1956(a)(1)(A)(i) of Title 18, which provides that whoever:

> [K]nowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity —
>
> (A)(i) with the intent to promote the carrying on of specified unlawful activity
>
> . . .
>
> shall be sentenced to a fine . . . or imprisonment . . . or both.

defraud, it is clear that the financial transaction advances and furthers the progress of the next step." *Id.* at 221. The jury was also entitled to conclude that the partial reimbursements to the initial investors were meant to dispel investor concerns, to quiet what are commonly referred to as "squeaky wheels," to keep investigators away from the scheme, and, in sum, to permit the fraud scheme to be perpetrated. We must sustain Curry-Robinson's convictions on the money laundering charges in Counts Five through Ten.

### D.

Curry-Robinson also maintains that the trial evidence was insufficient to support her convictions on Counts Eleven through Thirteen for making false declarations in a bankruptcy case, in violation of 18 U.S.C. § 152(3).[11] Significantly, Curry-Robinson was a real estate broker, an accountant, and a tax preparer. The evidence demonstrated that she omitted three important facts from two personal bankruptcy petitions she filed in the bankruptcy court for the Eastern District of Virginia: (1) her employment with Case Oil; (2) the monies she had received from Case Oil; and (3) in the second petition, the existence of five financial accounts through which Case Oil investments flowed. We have carefully reviewed the evidence, and we see it as sufficient to support the jury's finding that the false declarations charged in Counts Eleven through Thirteen were knowingly and fraudulently made.

### E.

Godwin and Curry-Robinson also raise several challenges to adverse evidentiary rulings at trial. Such rulings of a trial judge are not to be overturned by us absent an abuse of discretion. *See United States v. Russell*, 971 F.2d 1098, 1104 (4th Cir. 1992). In this instance, the defendants assert that the court improperly sustained several of the prosecutor's objections during defense cross-

---

[11]This bankruptcy statute provides that "A person who . . . knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury . . ., in or in relation to any case under title 11 . . . shall be fined . . ., imprisoned . . ., or both." 18 U.S.C. § 152(3).

examination of an FBI Agent. They also complain that the court refused to permit their proffered expert testimony on the rate of success of international oil refinery ventures. We have carefully reviewed these evidentiary rulings, and we conclude that they were well within the court's discretion.

F.

We also address three challenged rulings on the district court's application of the Sentencing Guidelines. These three contentions relate to (1) the calculation of loss attributable to a fraud scheme, USSG § 2S1.1; (2) the district court's enhancement of two levels for obstruction of justice, *id.* § 3C1.1; and (3) the enhancement of two levels for abuse of a position of trust. *Id.* § 3B1.3.

1.

Defendants contest the district court's criteria in quantifying the loss attributable to the fraud scheme under USSG § 2S1.1.[12] They contend that certain amounts of money paid by three non-testifying investors should not have been included in the calculation of loss attributable to the Case Oil fraud scheme. Further, they maintain that funds obtained in good faith should not have been included, and defendants also assert that money they had paid back to Case Oil investors should have been deducted from the calculation. We have held that "defendants [are] responsible for the value of all property taken, even though all or a part is returned." *Loayza*, 107 F.3d at 266. In this connection, the determination of loss attributable to a fraud scheme is a factual issue for resolution by the district court, and we review such a finding of fact only for clear error. *Id.* at 265. We have examined this contention carefully, and see no error, clear or otherwise, in the district court's application of § 2S1.1 and its determina-

_____

[12]USSG § 2S1.1 provides for increases in offense level based on the amount of funds involved in a money laundering conviction under § 1956(a)(1)(A). "The amount of money involved is included as a factor because it is an indicator of the magnitude of the criminal enterprise, and the extent to which the defendant aided the enterprise." *U.S. Sentencing Guidelines Manual* § 2S1.1, comment (2000).

tion of the loss attributable to the Case Oil fraud scheme. This challenge to the sentencing proceedings is accordingly without merit.

2.

Defendants also maintain that the sentencing enhancement for obstruction of justice, USSG §3C1.1,[13] does not apply to them, and that the district court erred in this regard. Although Godwin and Curry-Robinson both testified at trial to lack of fraudulent intent, the jury rejected their testimony in each instance, necessarily finding it false in order to convict. The district court's application of a sentencing enhancement for obstruction of justice against each defendant based on perjury was therefore appropriate. *See United States v. Dunnigan*, 507 U.S. 87, 96 (1993); *United States v. Keith*, 42 F.3d 234, 240-41 (4th Cir. 1994) (approving enhancement where defendant gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory"). This challenge to the sentencing of the defendants is also without merit.

3.

Curry-Robinson contends that the district court erroneously enhanced her sentence by two levels for abuse of a position of trust, USSG § 3B1.3.[14] As with the calculation issue, we may overturn the district court's finding that the sentencing enhancement applies to Curry-Robinson only if it is clearly erroneous. *See United States v. Mackey*, 114 F.3d 470, 475 (4th Cir. 1997). It is well settled that

---

[13]USSG § 3C1.1 increases defendant's placement by two levels if "the defendant willfully obstructed or impeded . . . the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction." USSG § 3C1.1 (2000).

[14]"If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense," USSG § 3B1.3 allows a two-level increase. The adjustment applies, inter alia, where the defendant "perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker." *U.S. Sentencing Guidelines Manual* § 3B1.3, comment (2000).

whether a defendant held a position of trust must be examined from the perspective of the victim. The sentencing court found ample evidence to support the sentencing enhancement for abuse of a position of trust, including that Curry-Robinson solicited investors through her work as an accountant and as a tax preparer, and through her social club. Morever, various witnesses testified that they gave money to Curry-Robinson for investment in Case Oil because they trusted her. We therefore conclude that Curry-Robinson's assertion of sentencing error on this point also lacks merit.

## III.

Finally, we turn to the contention of Godwin and Curry-Robinson that they were each deprived of a fair trial by judicial interference, i.e., by the judge's extensive involvement in the questioning of witnesses and by the prosecutorial role they claim the trial judge assumed. In this regard, it is settled that a trial judge possesses broad authority to interrogate witnesses. *See* Fed. R. Evid. 614(b) (providing that "[t]he court may interrogate witnesses, whether called by itself or by a party"). If a party perceives such questioning to be improper, an objection "may be made at the time or at the next available opportunity when the jury is not present." Fed. R. Evid. 614(c).

In this situation, both Curry-Robinson and Godwin's positions are seriously flawed by their failure to raise an objection to the judge's participation at trial. Curry-Robinson did not object until her post-trial motion for a new trial and, even more problematic, Godwin did not raise the claim until this appeal. Because both Godwin and Curry-Robinson failed to timely object, we may review their judicial interference contention only for plain error. To thoroughly address this issue, however, we must first evaluate and consider the applicable legal principles.

## A.

The rule that an objection must be timely raised with the trial court to preserve the right of appellate review is elementary, and it is of long standing. *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 238-39 (1940); Fed. R. Crim. P. 52(b).[15] The defense law-

---

[15]In direct appeals, the provisions of Rule 52(b) govern all allegations of constitutional error in convictions in the federal court system, and the

yers for Godwin and Curry-Robinson dropped the ball on this issue — which is a serious one — by failing to address it at trial,[16] and so we must address this contention as forfeited error.

B.

It was not until 1993, in *United States v. Olano*, 507 U.S. 725 (1993), that the Supreme Court clarified the limitations on appellate authority to correct forfeited error. Under *Olano*, we may not address a defendant's forfeited claim unless three requirements are met: (1) there is error, i.e., deviation from a legal rule, (2) the error is plain, meaning clear or obvious; and (3) the error affects substantial rights, actually changing the outcome of the trial proceedings.[17] *Id.* at 732-34. Even when these three prongs of *Olano* are satisfied, a court of appeals should not intervene unless "the error seriously affect[s] the

---

plain error standard enunciated in *Olano v. United States*, 507 U.S. 725 (1993), applies. *Johnson v. United States*, 520 U.S. 461, 466 (1997). Our sister circuits have reviewed judicial questioning issues, which we refer to as judicial interference claims, under the *Olano* standard. *See, e.g.*, *United States v. Salameh*, 152 F.3d 88, 128 (2d Cir. 1998); *United States v. Fernandez*, 145 F.3d 59, 65-66 (1st Cir. 1998); *United States v. Winstead*, 74 F.3d 1313, 1319 (D.C. Cir. 1996).

[16]The prosecution of this case, however, does not escape with clean hands. While it goes without saying that the defense lawyer has a mandate to protect the rights of his client, the prosecutor is also obligated to seek to prevent the appearance and reality of unfairness. The United States Attorney is "in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape nor innocence suffer." *Berger v. United States*, 295 U.S. 78, 87 (1935). It is the duty of the prosecutor "to use every legitimate means to bring about a just [conviction]," *id.*, as well as to protect the constitutional rights of the defendant. *United States v. Harrison*, 716 F.2d 1050, 1051 (4th Cir. 1983) ("The prosecutor, as much as any other officer in the judicial process, has an obligation to safeguard the right to trial by an impartial jury.").

[17]The phrase "affecting substantial rights" is not necessarily synonymous with "prejudicial," but in the ordinary case the terms will have the same meaning. *Olano*, 507 U.S. at 735; *see also United States v. Floresca*, 38 F.3d 706, 714 (4th Cir. 1994) (finding that structural error in constructive amendment of indictment is never harmless).

fairness, integrity or public reputation of judicial proceedings." *Id.* at 732. The Supreme Court has provided us guidelines in this regard by summarizing the differing analyses for preserved and forfeited error:

> When the defendant has made a timely objection to an error and Rule 52(a) applies, a court of appeals normally engages in specific analysis of the district court record — a so-called "harmless error" inquiry — to determine whether the error was prejudicial. Rule 52(b) normally requires the same kind of inquiry, with one important difference: It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice. In most cases, a court of appeals cannot correct the forfeited error unless the defendant shows that the error was prejudicial.

*Id.* at 734. Therefore, where the claimed error is one of trial interference by the judge, we may not intervene unless the "judge's comments were so prejudicial as to deny [the defendants] an opportunity for a fair and impartial trial." *United States v. Gastiaburo*, 16 F.3d 582, 589-90 (4th Cir. 1994) (citing *Stillman v. Norfolk & W. Ry. Co.*, 811 F.2d 834, 839 (4th Cir. 1987)).

Although we have usually reviewed judicial interference claims only for a "fair and impartial trial," we have indicated that we should review a defendant's contentions of judicial interference, where he failed to properly object, for plain error. *United States v. Castner*, 50 F.3d 1267, 1272 (4th Cir. 1995) (noting examination for "plain error," but not applying *Olano*). In such circumstances, however, we see no meaningful distinction between the "fair and impartial trial" standard recognized in our *Stillman* decision in 1987 and the *Olano* analysis established by the Court in 1993. A criminal trial that is unfair, in our view, contravenes both the *Stillman* and *Olano* standards.

The Supreme Court has observed that a fair trial, in the constitutional context, is one "whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In a similar vein, our good Chief Judge recently observed that "substantial rights are not affected when a picture-perfect proceeding would yield exactly the same result as that which actually transpired." *United States v. Promise*, 255 F.3d 150, 166 (4th Cir. 2001) (Wilkinson, C.J., concurring in part and con-

curring in the judgment); *see also Neder v. United States*, 527 U.S. 1, 15 (1999) (noting that constitutional error is harmless if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained"); *United States v. Villarini*, 238 F.3d 530, 536 (4th Cir. 2001) ("A new trial is required only if the resulting prejudice was so great 'that it denied any or all the appellants a fair, as distinguished from a perfect, trial.'") (quoting *United States v. Parodi*, 703 F.2d 768, 776 (4th Cir. 1983)).

Our utilization of the *Olano* framework to analyze a judicial interference claim has the added benefit of clarifying the burden of proof. If a defendant has timely objected at trial, we may correct an error if the Government fails to prove that the error was harmless. When the defendant did not timely object, however, (and these defendants did not) the burden lies with the defendant to convince us that the error affected his substantial rights. *See Olano*, 507 U.S. at 734-35; *United States v. Hastings*, 134 F.3d 235, 240 (4th Cir. 1998). We will therefore consider the judicial interference claims of Godwin and Curry-Robinson under the *Olano* analysis.

C.

Godwin and Curry-Robinson maintain that they were denied a fair trial when the judge inappropriately took an "increasingly activist role in questioning witnesses." Appellants' Brief at 42. In support of their allegation, the defendants point to several interchanges between the judge and certain witnesses. They contend, inter alia, that the judge cross-examined Curry-Robinson at length, that the judge interrupted cross-examination of prosecution witnesses and rehabilitated them, and that the court asked leading questions that suggested answers favorable to the prosecution. In sum, they contend that the trial judge undertook a role in favor of their prosecution, unfairly lending the court's credibility — in plain view of the jury — to the interests of the Government and against the defendants. A few of the specific points on which Godwin and Curry-Robinson rely are summarized below:

- After Curry-Robinson testified that there were potentially profitable Case Oil projects other than failed currency, power plant, sugar, and vodka deals, the judge

challenged her: "[N]ame them. What are they? What are these projects you were working on for ten years waiting to come through?" *Id.* at 44-45.

- During direct examination of Curry-Robinson, the judge repeatedly intervened (her attorney points to six occurrences) to emphasize that Case Oil never earned any money, despite a stipulation by counsel, made in front of the jury, to that effect. *Id.* Defendants assert that "[t]he only reason for these continued questions . . . was to improperly emphasize to the jury that this was the issue." *Id.* at 45.

- When Curry-Robinson testified about procuring investments from her friends, the judge interrupted with questions on how she could "justify in [her] mind" guaranteeing returns within six months "when back in 1990 William Wishmeyer gave you his money, and still so many years later you still owed Mr. Wishmeyer? How could you put 'guaranteed in six months' when nothing was coming through?" *Id.* at 45-46.

- The judge promptly followed up with the query, "And you did that in 1990, and nothing has come through for six, seven years. How could you still be doing that six, seven years later?" *Id.* at 46.

- After Curry-Robinson testified that she had given the "security" checks openly and was not hiding anything, the court interceded to ask why she did not leave the money in the bank account that the security check was written on. There was then an extended colloquy in which the judge specifically examined the witness with respect to a government exhibit and individual investors, and the judge interjected the damaging point that some of the money appeared to have been spent on a cruise. J.A. 804-06.

- During cross-examination, the prosecution asked Curry-Robinson about a kidnapping allegedly used as an excuse

for nonpayment. The judge then changed the subject to ask several questions about what Case Oil had invested in and where the money was deposited, including "Well, why didn't you tell the, quote, investors, like Mr. Goodrich, that I'm not going to be putting this into a specific investment, I'm covering expenses so that the investments can ultimately come through?" *Id.* at 829-30.

- During cross-examination of Curry-Robinson about whether later investors would approve the use of their funds to pay earlier investors, the judge "just opened the exhibit book" to a particular receipt and began to question about the meaning of the notation and return date on the receipt: "But you've got a return date of March 15 and amount of return $10,000. Now, what in the world did you intend by that if you didn't intend for somebody to get $10,000 back on March 15?" *Id.* at 835.

- The judge interrupted cross-examination of the Government's bankruptcy expert, allegedly to ensure the jury was not persuaded by the questioning. The judge posed a hypothetical question to the expert to show that monies Curry-Robinson received should be reflected elsewhere on the bankruptcy petition even if it were not "income," undercutting the point the lawyer had made. Appellants' Brief at 42.

- When Mr. Grinnalds[18] asked a prosecution witness whether Curry-Robinson had instructed removal of a certain account from the bankruptcy petition (to show that the witness had information not reflected on the petition) the judge interrupted and asked: "Did she review it — you gave her this filing to review and sign before it was submitted?" J.A. 481. Defendants contend that the question indicated that any omission was Curry-Robinson's responsibility, undermining the defense. Appellant's Brief at 43.

---

[18]Mr. Grinnalds served as Curry-Robinson's court-appointed lawyer at trial, and he also serves in that capacity on appeal.

- During examination of that same witness, defense counsel established that it was not unusual to make mistakes in preparing bankruptcy petitions. The judge then asked the witness whether he had filed any amendments to the petitions, detracting from the impact of counsel's question. *Id.*

We have carefully reviewed the trial record and make the following observations. Early in the trial, the judge sometimes interrupted the examining attorneys, though usually for no more than a single question, to clarify testimony or to ensure the proper foundation for an exhibit. Some of these inquiries elicited additional evidence, such as why investors continued to give checks to Curry-Robinson, or whether the testifying investor had ever received money from the Case Oil investment. During the defense presentation, however, the court became much more actively involved, repeatedly questioning Curry-Robinson in a forceful manner. Time and again, the court engaged in active questioning unfavorable to the defense, particularly to Curry-Robinson.

As the trial progressed, the judge revealed skepticism of the defendants' evidence, referring cynically to the "quote, investors." J.A. 830. During Curry-Robinson's direct examination, the judge interjected such inquiries as:

- "Well, you are an accountant and a businesswoman. How in the world were you going to enforce this kind of deal?" *Id.* at 725.

- "You can't wander in and out of the country with over $10,000, can you?" *Id.* at 731.

These questions may be construed to reflect the court's disbelief of Curry-Robinson, and, as Mr. Grinnalds claims, they may have impaired his presentation of his client's testimony. In one exchange, Mr. Grinnalds asked Curry-Robinson whether she had carefully re-read bankruptcy petitions (prepared by Mr. Smith) that omitted certain bank accounts:

A.   No, he just — he went through them very quickly, and I said yes. It was not anything intentional on my part, no reason to withhold those bank accounts. No reason to say that I had income or didn't have income when I did.

I did those schedules to the best of my knowledge but Mr. Smith — in retrospect, of course, I should have read them more closely perhaps, but it was certainly nothing criminal. I had no criminal intent when I did that. I was acting in good faith.

MR. GRINNALDS:   If I may, Your Honor?

THE COURT:   When you prepare somebody's tax return and they sign it, who is ultimately responsible for it, you as the preparer, or the person signing that return?

THE WITNESS:   The person that signs the return . . . .

*Id.* at 813. Viewed in context, the court interrupted the defense attorney, and very effectively cross-examined the defendant. And when the prosecutor cross-examined Curry-Robinson, the judge interjected additional questions, such as "Was hundreds of thousands, nickels and dimes to you?" *Id.* at 839.

In October 1999, following her convictions, Curry-Robinson sought a new trial claiming her trial was tainted by judicial interference. Five months later, in its opinion of March 2000, the court overruled the motion and expressed strong dissatisfaction with her lawyer's trial performance.[19] The judge wrote that "the court had tre-

---

[19]If the judge believed the defendants were receiving ineffective assistance, she failed to apply a proper remedy. If a defendant is being inadequately represented, several options are available. For example, the judge may admonish defendant's counsel, take steps to ensure that facts favorable to the defense are presented, or it may be justified in declaring a mistrial. In its post-trial order of March 2000, the court relied extensively on *United States v. Williams*, 411 F. Supp. 854 (S.D.N.Y. 1976). The judge in *Williams*, however, declared a mistrial, sua sponte, to protect the defendant's right to a fair trial when he perceived the defendant was being inadequately represented.

mendous concern over [Mr. Grinnalds'] ability to properly question his client so as to present her case effectively and so as to avoid her perjuring herself." *Id.* at 1190. The judge also observed:

> [T]he court was compelled to interject questions during the testimony of Ms. Curry-Robinson in order to clarify and focus confused factual issues, establish the relevance, if any, of proffered documents, and generally compensate for the deficiencies in the presentation of the evidence by court-appointed counsel. The court's questions were not in any way suggestive of any answer or indicative of any animosity toward Ms. Curry-Robinson.

*Id.* at 1191.[20]

### D.

Notwithstanding the broad discretion accorded trial judges, we have repeatedly observed that a judge has no "impregnable cloak of immunity," and he must maintain such a demeanor that "every one shall recognize that what is said from the bench is the cool and well-balanced utterance of an impartial judge, and has in it naught of the heat and partisanship of the advocate." *Wallace v. United States*, 281 F.2d 656, 665 (4th Cir. 1960) (quoting *Quercia v. United States*, 289 U.S. 466, 470 (1933)). Judge Boreman observed in *Wallace* that while a judge may examine and cross-examine,

---

[20]We are unable to agree with the condemnation of defense counsel. Although the lawyers failed to timely preserve the judicial interference claim, the record reflects that they worked diligently (including on this appeal) on behalf of their clients in this complex mail fraud and money laundering prosecution. In this case, one of the two trial lawyers and both of the lawyers on appeal were appointed. We note that many able members of the bar are unwilling to accept such assignments, and other lawyers see themselves as unqualified or financially unable to represent indigents in criminal cases. We also recognize that defending economic crime charges — such as these — requires substantial investments of time for which the compensation structure of our criminal justice system fails to sufficiently account. From our vantage point, these defendants received able representation, and these lawyers seem to have performed both aggressively and professionally on behalf of their clients.

*when a judge cross-examines a defendant and his witnesses extensively and vigorously, he may* present to others an appearance of partisanship and, in the minds of jurors, so *identify his high office with the prosecution* so as to impair the impartiality with which the jury should approach its deliberations.

*Id.* at 666. (internal quotation omitted) (emphasis added) (reversing for prejudicial error where judge "highlighted what appeared to be inconsistent and conflicting statements" by defendant, "generally casting the dark shadow of evasiveness around his testimony on this point and creating the impression that the [c]ourt may have adroitly and skillfully forced the truth from a fumbling and dodging defendant"); *see also Castner*, 50 F.3d at 1272 ("[T]he court must not create an appearance of partiality by continued intervention on the side of one of the parties or undermine the effective functioning of counsel through repeated interruption of the examination of witnesses."). A court's "participation during trial . . . [should] never reach[] the point at which it appears clear to the jury that the court believes the accused is guilty, . . . or becomes so pervasive in his interruptions and interrogations that he may appear to usurp the role of either the prosecutor or the defendant's counsel." *Parodi*, 703 F.2d at 775 (internal citations and quotations omitted). In fact,

> [i]t is far better for the trial judge to err on the side of [a]bstention from intervention in the case rather than on the side of active participation in it, especially when the major part, if not all of his interruptions and interventions, though by chance rather than by design, are, or seem to be on, or tending to be on, the side of the government.

*United States v. Cassiagnol*, 420 F.2d 868, 878 (4th Cir. 1970) (quoting *Blumberg v. United States*, 222 F.2d 496, 501 (5th Cir. 1955)).

In *United States v. Head*, 697 F.2d 1200 (4th Cir. 1982), the defendant asserted judicial interference when the court interjected itself over 2,400 times in a four-day trial. Head maintained that the judge's questions, combined with adverse evidentiary rulings (some based on judicial misconstructions of both facts and law), put the judge in part-

nership with the prosecution.[21] Judge Phillips — who might well have been discussing this case — observed that "there was in this trial a distressingly frequent exercise of the trial court's undoubted discretionary prerogative — and duty on appropriate occasions — to intervene sua sponte in the proceedings." *Id.* at 1210. There was no prejudice, however, because the judge's "patent overinvolvement" and criticisms were directed at both sides, not affecting one more than the other. *Id.*; *cf. Anderson v. Warden, Md. Penitentiary*, 696 F.2d 296, 299 (4th Cir. 1982) (finding prejudice, in harmless error analysis, where "[t]he judge openly and successfully pressed defendant's two key witnesses to change their testimony"); *Cassiagnol*, 420 F.2d at 878 (finding prejudicial error where court interrupted both defendant's direct examination and defense counsel's summation with comments characterized as "sharp," "critical," and "chiding"). As we explained in the *Head* decision, "we review for prejudicial trial court error in the specific case and not, except in the most occasional exercise of our supervisory powers, generally to police the conduct of trials against some general model of judiciousness." *Head*, 697 F.2d at 1210.

In our view, cross-examination of a witness by the trial judge is potentially more impeaching than such an examination conducted by an adversary attorney. The judge, by his office, carries an imprimatur of impartiality and credibility in the eyes of the jury.[22] In fact, a

---

[21]It is not clear in *Head* whether an objection was timely made. The issue there was reviewed as a fundamental fairness claim similar to that which we address here. *See Virgin Islands v. Smith*, 949 F.2d 677, 684 n.7 (3d Cir. 1991) (noting the "striking" similarity between due process standard of fundamental unfairness and plain error "requirement that the error must undermine the fundamental fairness of the trial and contribute to a miscarriage of justice"); *United States v. McGuire*, 608 F.2d 1028, 1034 (5th Cir. 1979) (analyzing allegation under plain error doctrine for denial of due process or fair trial, where reversal is only for obvious errors affecting fairness, integrity, or public reputation of judicial process).

[22]Although the trial judge, in charging the jury, may comment upon the evidence, so long as it is also clear that the jury determines all matters of fact, that comment must be to "analyze and dissect" the evidence rather than to add to it. *Quercia*, 289 U.S. at 470. The Supreme Court has

judge's apparent disbelief of a witness is potentially fatal to the witness's credibility. And the credibility of a testifying defendant is often of crucial importance in a criminal trial. In a close case, the judge's intervention may more readily impact the defendant's right to a fair trial. Therefore, "[t]he trial judge must always remember that he occupies a position of preeminence and special persuasiveness in the eyes of the jury, and, because of this, he should take particular care that his participation during trial — whether it takes the form of interrogating witnesses, addressing counsel, or some other conduct — never reach[es] the point at which it appears clear to the jury that the court believes the accused is guilty." *Parodi*, 703 F.2d at 775 (internal citations and quotations omitted).[23]

Even when the evidence provides the court with a negative impression of the defendant, the judge must refrain from interjecting that perception into the trial. He is always obliged to retain the "general atmosphere of impartiality" required of a fair tribunal, and must not — under any circumstance — become an advocate for the prosecution. In sum, ours is an adversary system, and "[t]he trial of a case [is] a three-legged stool — a judge and two advocates." Warren E. Bur-

---

"emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence should be so given as not to mislead, and especially that it should not be one-sided." *Id.* (internal quotation omitted). It is a time-honored concept, "of fundamental importance" to our system, "that justice should not only be done, but should manifestly and undoubtedly be seen to be done." *Rex v. Sussex Justices*, 1 K.B. 256, 259 (1924).

[23]Our sister circuits subscribe to similar positions. *See, e.g.*, *United States v. Victoria*, 837 F.2d 50 (2d Cir. 1988); *United States v. Bland*, 697 F.2d 262, 265-66 (8th Cir. 1983) ("A judge's slightest indication that he favors the government's case can have an immeasurable effect upon a jury."); *United States v. Hoker*, 483 F.2d 359, 368 (5th Cir. 1973) ("The position of a trial judge carries such overpowering weight before a jury that we can not be certain that the verdict was that of the jury uninfluenced by a desire to bring in a verdict calculated to please the judge."); *United States v. Hill*, 332 F.2d 105, 106 (7th Cir. 1964) ("The Government was represented by able trial counsel and there was no apparent reason why that counsel needed any help on the cross-examination of the defendant or defendant's witnesses.").

ger, *in Simpson's Contemporary Quotations* 63 (James B. Simpson ed., Houghton Mifflin 1988). The obligation of the prosecutor is to prosecute, while that of the defense lawyer is to defend, each in an aggressive and professional manner. And the judge must judge — fairly and impartially.

Our ultimate concern, of course, must be whether "the trial judge's comments were so prejudicial as to deny a party an opportunity for a fair and impartial trial." *Stillman*, 811 F.2d at 839 (quoting *Miley v. Delta Marine Drilling Co.*, 473 F.2d 856, 857-58 (5th Cir. 1973)). On the other hand, while a criminal defendant "is entitled to a fair trial" he is not entitled to "a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619 (1953). Nevertheless, we are mindful of the fact that "[a] fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). The proper role of a trial judge, most simply, is "to see that justice is done in the cases heard before him." *Simon v. United States*, 123 F.2d 80, 83 (4th Cir. 1941). Given this setting, we turn to the application of these legal principles to the facts of this case.

### E.

As we have said, the lack of a timely objection to the judge's interaction with witnesses limits our consideration of this issue to the *Olano* plain error analysis. Although Rule 614(c) expands the meaning of "contemporaneous" objection to allow counsel to refrain from challenging the judge in front of the jury, no reasonable application of this Rule allows a defendant to first raise the issue in a post-trial motion for a new trial. It is apparent, however, that the court became overly involved in the questioning of witnesses in this case. Indeed, it would not be difficult to conclude that the court's interruptions and interventions abused its discretion and, in the words of Judge Murnaghan, seemed "to be on, or tending to be on, the side of the Government." *Cassiagnol*, 420 F.2d at 878. Without belaboring the point, we simply assume trial error and proceed with the *Olano* analysis. We will therefore consider whether, in light of the evidence, the judge's involvement constitutes plain error depriving either Godwin or Curry-Robinson of a fair trial.

### 1.

As noted earlier, *supra* Part III.B, when we review an issue only for plain error, we examine for (1) error; (2) that is plain; and (3) that affects substantial rights. *See United States v. Olano*, 507 U.S. 725, 732-34 (1993). Even if all three prongs are met, it is within our discretion whether to remedy the error, and we should refrain from intervening unless the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 736.

### 2.

As to prong one of *Olano*, we will assume, as we have said, that trial error was committed. Regarding *Olano*'s second prong, an error is plain when the law at the time is settled. *See Hastings*, 134 F.3d at 239. As we recognize, the legal principles governing judicial interference claims have been long settled. *See supra* Part III.D.

### 3.

With the first two elements of the *Olano* inquiry satisfied, we turn to the third step in that analysis. In order to establish an effect on their substantial rights, the defendants must demonstrate to us "that the error actually affected the outcome of the proceedings." *Hastings*, 134 F.3d at 240. As such, Godwin and Curry-Robinson must establish "that the jury actually convicted" them based upon the trial error. *Id.* The defendants fail on this third prong of *Olano*. Because of the compelling and overwhelming evidence presented against them, we are unable to conclude that the jury convicted either Godwin or Curry-Robinson because of the judge's actions during their trial.

It is clear from the record that Curry-Robinson bore the brunt of the judge's interrogation. As a result, the issue of prejudicial error is closer with respect to her than it is with respect to defendant Godwin. Nonetheless, neither Curry-Robinson nor Godwin contested the essential facts of the case: (1) they solicited money for oil investments, (2) no investments occurred, and (3) they used the invested funds (a) for their personal benefit and (b) to make payments to complaining earlier investors. Additionally, they made repeated false rep-

resentations that covered up and furthered the scheme, such as concealing income on bankruptcy petitions. While Curry-Robinson and Godwin asserted a belief that the "investments" would pay off, the facts are entirely inconsistent with this assertion. They made blatantly false claims in solicitation letters, for example, that Case Oil had confirmed contracts that it did not possess. They also systematically advised investors that Case Oil investments would have phenomenally high rates of return in a guaranteed time frame. Not only did Godwin and Curry-Robinson make promises they did not keep, they continued to make similar promises after having reneged on their initial representations. In fact, Case Oil never completed a single business deal; had no books, records, or income; and had essentially no assets.

The defenses of Godwin and Curry-Robinson, as they presented them to the jury, centered almost entirely on the issue of intent, i.e., good faith. Importantly, however, the defendants failed to produce any corroborating evidence of good faith. *See supra* Part II. In the face of the overwhelming evidence presented against them by the Government, there was no reasonable probability that the good faith defense would succeed. *United States v. White*, 238 F.3d 537, 540 (4th Cir. 2001) (upholding conviction where evidence was overwhelming and there was no reasonable probability that defense based on excluded evidence would have succeeded). Where the evidence is overwhelming and a perfect trial would reach the same result, a substantial right is not affected. *See, e.g.*, *United States v. Moore*, 11 F.3d 475, 482 (4th Cir. 1993) (finding no effect on substantial right from prosecutor's improperly calling defendant a liar where, due to overwhelming evidence, "the remark added little to the government's case").[24] In the final analysis, the Government needed no assistance

---

[24]In this situation, any possible prejudice to Goodwin and Curry-Robinson was also mitigated by the jury instruction that the jury was to find the facts. *See United States v. Billups*, 692 F.2d 320, 327 (4th Cir. 1982). The court specifically directed the jury to "neither infer anything from the questions of the court nor consider whether the court had an opinion about the case." *Villarini*, 238 F.3d at 537 (holding that any prejudice from three questions over course of a four-day trial was cured by this instruction); *see also United States v. Pratt*, 239 F.3d 640, 645 (4th Cir. 2001); *United States v. Wilson*, 135 F.3d 291, 307 (4th Cir. 1998).

from the court. The well-prepared and able Government prosecutors would have cross-examined Curry-Robinson in much the same manner as did the judge.

Notwithstanding the actions of the judge, the good faith defenses of Godwin and Curry-Robinson were predestined to failure. On this record, the defense faced a daunting task — indeed an impossible one — which can be appropriately likened to an effort to "make a silk purse from a sow's ear." While the participation of the judge is troublesome, we must examine this proceeding in its overall context. Having done so, we conclude that any trial error of judicial interference did not affect the substantial rights of either Godwin or Curry-Robinson.

IV.

Pursuant to the foregoing, the convictions and sentences of defendants Godwin and Curry-Robinson are affirmed.

*AFFIRMED*

MICHAEL, Circuit Judge, dissenting:

The majority makes a convincing case that the trial judge's hostile and extensive questioning of defense witnesses made it appear that she was on the side of the government. *See ante* at 16-28. The only problem is that the majority stops short of vacating the defendants' convictions. Because the judge's many questions and comments revealed — in front of the jury — a deep skepticism or disbelief of the defense case, the defendants did not receive a fair trial. I would therefore vacate their convictions and grant them a new trial.

I.

This case must be analyzed, as the majority says, under the forfeited error framework established in *United States v. Olano*, 507 U.S. 725 (1993). I agree with the majority that the trial judge "became overly involved in the questioning of witnesses in this case." *Ante* at 28. Indeed, the judge was "so pervasive in [her] interruptions and

interrogations that [she] . . . appear[ed] to usurp the role of . . . the prosecutor." *United States v. Parodi*, 703 F.2d 768, 776 (4th Cir. 1983). Accordingly, the judge's approach was plain error, a point the majority does not challenge. Moreover, as I will explain, the error affected the substantial rights of the defendants.

As a general rule, an error affects substantial rights only when the defendant establishes that the error was prejudicial, that is, it "affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734. But a showing of actual prejudice is not required in every instance: "[t]here may be a special category of forfeited errors that can be corrected regardless of their effect on the outcome." *Id.* at 735. As we have said, "[e]rrors that are not susceptible to harmless error review fall within this special category and therefore 'necessarily' affect substantial rights." *United States v. Neal*, 101 F.3d 993, 999 (4th Cir. 1996). When the trial judge unmistakably adopts the role of prosecutor, there is a "special category" error that affects substantial rights regardless of whether the defendant can show actual prejudice. *See Neal*, 101 F.3d at 999 (finding a "special category" error, not requiring a showing of actual prejudice, when the trial judge fully assumed the role of prosecutor in a criminal contempt proceeding); *United States v. Van Dyke*, 14 F.3d 415, 423 n.1 (8th Cir. 1994) ("[W]e consider the court's excessive intervention and lack of neutral- ity as plain error which deprived the defendant of a fair trial."); *Ari- zona v. Fulminante*, 499 U.S. 279, 309-10 (1991) (citing *Tumey v. Ohio*, 273 U.S. 510 (1927), for the proposition that a showing of actual prejudice is not required when the trial judge lacks impartial- ity). A defendant, in sum, has a right to an impartial judge — one who takes care not to signal to the jury that she believes the defendant is guilty. This right to an impartial judge cannot be trampled, not even by overwhelming evidence of guilt. *See Tumey*, 273 U.S. at 535 ("No matter what the evidence was against [the defendant], he had the right to have an impartial judge.").

II.

The majority lays out ample proof that the judge's repeated inter- jections made it appear that she was biased against the defendants. The majority provides examples of how the judge "[t]ime and again . . . engaged in active questioning unfavorable to the defense," *ante*

at 22; repeatedly and forcefully questioned defendant Curry-
Robinson, both on direct and cross, leaving the impression that she
(the judge) did not believe her, *ante* at 19-22; rehabilitated prosecu-
tion witnesses who had been impeached under defense questioning,
*ante* at 19; and repeatedly reinforced damaging points that the defen-
dants had already conceded, *ante* at 20. A few numbers illustrate how
pervasively the judge conveyed her skepticism of the defendants'
case:

- When defendant Curry-Robinson took the stand for
  direct testimony, her lawyer asked opening questions that
  take up about four pages of transcript. The judge then
  weighed in and asked questions that cover the next eight
  pages of transcript. J.A. 719-731. This pattern continued
  throughout the rest of Curry-Robinson's testimony.

- Over the course of Curry-Robinson's direct testimony,
  which fills almost 100 pages of transcript, the judge
  asked roughly one-third (over 100) of the questions,
  compared to just over 200 asked by Curry-Robinson's
  lawyer. J.A. 719-813. Of the questions asked by the
  judge during Curry-Robinson's direct testimony, at least
  36 were cross-examination. The judge's cross-
  examination covered virtually every significant issue
  about which Curry-Robinson attempted to testify, includ-
  ing her defense of good faith.

- During Curry-Robinson's cross-examination by the pros-
  ecution, the judge again asked roughly one-third of the
  questions, about 25, compared to about 55 questions
  asked by the prosecutor. J.A. 825-843.

- Again, as the majority has indicated, many of the judge's
  questions and comments during the direct and cross-
  examination of Curry-Robinson showed disdain toward
  Curry-Robinson and disbelief of her testimony.

The extent, tone, and severity of the judge's questioning make it
clear that she in effect assumed the role of prosecutor. This does not
matter, the majority argues, because the "prosecutors would have

cross-examined Curry-Robinson in much the same manner as did the judge," if that had been necessary. *Ante* at 31. The majority's argument misses the point, I respectfully suggest. The judge's cross-examination was more effective than the prosecutor's for several reasons. The judge was not constrained by normal trial procedures. The judge interrupted defense counsel throughout his direct examination of Curry-Robinson, effectively undertaking a point-by-point impeachment of her story. The judge repeated questions that had been asked and answered, driving home damaging points. What is most critical, the judge's questions and comments had the imposing weight of the judge's office behind them. Because the judge occupies a position of "special persuasiveness in the eyes of the jury," *Parodi*, 703 F.2d at 775 (internal quotation omitted), the jury could well have concluded that the judge believed that the defendants were guilty. This, I believe, deprived the defendants of a fair and impartial trial. I do not suggest that the able and dedicated judge in this case intentionally set out to take on a prosecutorial role or to deprive the defendants of a fair trial. In light of the government's evidence, her frustration with the defense case is understandable. Still, it would have been far better if she had erred on the side of non-intervention.

Because the judge adopted the role of the prosecutor for extended stretches during the trial, there is a "special category" error that necessarily affected the substantial rights of the defendants. *See Olano*, 507 U.S. at 735; *Neal*, 101 F.3d at 999. Even when a forfeited error is plain and affects substantial rights, we should reverse only if the error also "seriously affect[s] the fairness, integrity, or public reputation of [the] judicial proceedings." *Olano*, 507 U.S. at 736 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936) (first alteration in original)). For the reasons I have already mentioned, this last requirement is present in this case. As a result, I respectfully dissent from the majority's ultimate decision to affirm the convictions. I would grant Curry-Robinson and Godwin a new trial.